## APPEAL OF NORTHWESTERN YEAST CO.

Docket No. 1511.   Decided October 27, 1926.

A corporation expended large sums of money in an advertising and promotion campaign over a period of years, and the portions thereof respectively allocable to capital for the building up of future business, and to current expense for the maintenance of current business, can not be segregated. *Held,* the disallowance of the

entire expenditure and of any portion thereof as invested capital is proper. *Held, further,* that under the facts of this case the petitioner is entitled to have its profits tax computed under the provisions of section 328 of the Revenue Act of 1918.

*William M. Williams, Esq.,* and *John G. Weisbach, Esq.,* for the petitioner.

*Lee I. Park, Esq.,* for the Commissioner.

Deficiency for 1920 of $246,486.97 income and profits tax. Originally the petition alleged several errors, but by withdrawal, stipulation or other disposition the only issue now in dispute is the petitioner's right to include in its invested capital an aggregate amount of $2,734,900.31, alleged to have been expended by it prior to 1909 in an advertising and promotion campaign and charged off at the time of expenditure through profit and loss. The parties at the hearing presented an agreed statement of facts, all of which, with certain minor changes in form, is embodied in the following findings. This statement was supplemented by oral testimony of witnesses for the petitioner.

### FINDINGS OF FACT.

The petitioner was incorporated in Illinois on April 14, 1893, with a capital stock of a par value of $1,000,000, all of which was subscribed and paid for in cash.

Shortly after its incorporation petitioner purchased for $600,000 all of the assets of the Northwestern Yeast Co. of Wisconsin, which had been manufacturing and selling a product known as "Yeast Foam." At about the same time petitioner also purchased for $400,000 all of the assets of a business which had been conducted by E. W. Gillett, of Chicago, Ill., consisting of the manufacture and sale of another yeast product known as "Magic Yeast."

The products manufactured by the petitioner were the said Magic Yeast and Yeast Foam, and in 1893 the sales of these products were largely limited to farmers and to housewives in small villages and towns who did their own baking. The business was confined to certain localities in the States of Illinois, Iowa, Kansas, Michigan, Minnesota, Missouri, and Wisconsin; and in other localities the products were known or used but slightly or not at all.

Petitioner adopted a plan to expand and enlarge its sales territory to include the entire United States, organized an advertising department, and borrowed $30,000 for advertising purposes.

The plan consisted of a selection of routes in the localities where the products were not known or used, or were but slightly known and

used, and the distribution of samples of its products to the house-wives in those localities. These distributions were made by persons employed for the purpose, whose salary and expenses were paid by the petitioner. These persons also posted at prominent places in the localities signs advertising the products and distributed illus-trated printed matter respecting the products. These persons were not employed as salesmen and did not attempt to sell any goods. No salesmen were employed because they were considered unnecessary and likely to defeat the plan by overselling and thus to bring about a surplus of stale goods in the hands of dealers.

Pursuant to the plan, the petitioner mapped out each year addi-tional territory in which it distributed samples of its products and advertising matter. After 1908 no further territory was added, ex-cept that localities which were within the limits of existing routes would be included when the population increased sufficiently to justify such action.

From 1893 to 1908, both inclusive, petitioner expended $2,884,-172.51, included in its advertising account. From 1909 to 1921, in-clusive, petitioner expended $3,580,763.16 for advertising. These amounts are shown more in detail as follows:

|  | 1893–1908. | 1909–1921. |
|---|---|---|
| Advertising—display ads | $39,610.04 | $29,721.33 |
| Advertising—magazines, periodicals, billboards |  | 1,025,181.84 |
| Advertising—posters, etc | 81,665.50 | 135,162.45 |
| Cost of samples | 304,878.97 | 168,343.09 |
| Exhibit expense, fairs, etc | 3,799.05 |  |
| Folding promotion circulars (including clerical and shipping) | 85,326.16 | 72,370.59 |
| Freight on samples | 3,908.42 | 2,358.43 |
| Packing and wrapping material | 32,020.85 | 29,603.28 |
| Postage | 7,645.29 | 8,585.48 |
| Printed matter, etc | 201,583.52 | 447,013.67 |
| Agents' expenses | 755,071.77 | 971,809.43 |
| Agents' salaries | 614,730.07 | 713,190.82 |
| Promotion, men's salaries and expenses | 692,094.80 |  |
| Stationery and supplies | 2,356.65 | 1,812.41 |
| Cook books sold [in red] | −518.58 |  |
| Sale of yeast [in red] |  | −24,389.66 |
| Total | 2,884,172.51 | 3,580,763.16 |

In addition to the foregoing expenditures petitioner expended various sums for replacing its stale products in the hands of dealers with fresh articles, which method is known by it as the " supporting method " of advertising. This was facilitated by the use of an age key denoting the date of manufacture which was placed by petitioner upon each box of its yeast. These replacements were made by the persons who distributed the samples. The cost of the goods used for such replacements, not including the cost of distribution, from 1893 to 1908, inclusive, and from 1909 to 1921, inclusive, is as follows:

| | | | | | |
|---|---|---|---|---|---|
| 1893 | $1,987.98 | 1903 | $5,164.38 | 1913 | $14,644.70 |
| 1894 | 1,923.63 | 1904 | 9,863.61 | 1914 | 16,828.66 |
| 1895 | 8,017.17 | 1905 | 13,155.32 | 1915 | 13,449.92 |
| 1896 | 9,306.34 | 1906 | 11,934.99 | 1916 | 10,256.34 |
| 1897 | 7,849.65 | 1907 | 12,469.11 | 1917 | 8,211.80 |
| 1898 | 8,497.44 | 1908 | 13,256.06 | 1918 | 8,261.88 |
| 1899 | 8,044.60 | 1909 | 10,266.84 | 1919 | 8,189.43 |
| 1900 | 7,085.20 | 1910 | 8,220.17 | 1920 | 5,537.96 |
| 1901 | 7,490.35 | 1911 | 10,882.48 | 1921 | 10,801.15 |
| 1902 | 4,019.94 | 1912 | 11,745.33 | | |

The cost of distributing these replacements is included in the advertising costs set forth above, but the portion attributable thereto, although slight, can not be segregated.

All the foregoing amounts, and also the amount of $2,884,172.51 and the amount of $3,580,763.16 shown above, were charged to profit and loss on petitioner's books in the particular year in which they were incurred. In addition petitioner had certain overhead expenses in making such replacements which were charged to general expenses and as to which no segregation can be made.

The number of cakes of its yeast products produced and sold by petitioner from 1893 to 1921, inclusive, and the number of cakes distributed as samples and to replace stale cakes, are as follows:

| Year. | Total production. | Sales. | Samples distributed. | Replacement of stale products. |
|---|---|---|---|---|
| 1893 | 187,333,133 | 180,752,796 | 5,389,930 | 1,190,407 |
| 1894 | 200,645,774 | 192,313,800 | 7,180,100 | 1,151,874 |
| 1895 | 206,949,069 | 196,005,600 | 6,142,769 | 4,800,700 |
| 1896 | 220,699,154 | 205,051,896 | 10,074,600 | 5,572,658 |
| 1897 | 222,260,673 | 206,936,604 | 10,623,680 | 4,700,389 |
| 1898 | 240,837,675 | 225,690,948 | 9,263,853 | 5,882,874 |
| 1899 | 266,532,915 | 251,288,100 | 10,307,929 | 4,936,886 |
| 1900 | 288,881,369 | 270,974,340 | 13,664,395 | 4,242,634 |
| 1901 | 313,749,758 | 297,500,364 | 11,883,915 | 4,365,470 |
| 1902 | 337,313,430 | 321,768,468 | 13,137,813 | 2,407,149 |
| 1903 | 340,811,183 | 321,829,452 | 15,889,288 | 3,092,443 |
| 1904 | 349,256,652 | 329,589,792 | 13,760,507 | 5,906,353 |
| 1905 | 364,060,193 | 344,456,784 | 11,731,960 | 7,871,449 |
| 1906 | 383,758,714 | 364,485,996 | 12,126,018 | 7,146,700 |
| 1907 | 399,202,171 | 385,206,318 | 6,529,320 | 7,466,533 |
| 1908 | 421,053,415 | 408,759,246 | 4,356,409 | 7,937,760 |
| 1909 | 404,231,772 | 391,971,888 | 6,112,076 | 6,147,808 |
| 1910 | 400,449,946 | 389,557,080 | 5,970,010 | 4,922,856 |
| 1911 | 413,399,432 | 402,035,724 | 4,847,253 | 6,516,455 |
| 1912 | 423,060,790 | 410,487,588 | 5,540,071 | 7,033,131 |
| 1913 | 411,947,702 | 398,468,052 | 4,710,369 | 8,769,281 |
| 1914 | 400,368,052 | 381,878,388 | 8,412,622 | 10,077,042 |
| 1915 | 376,225,922 | 361,491,012 | 6,681,066 | 8,053,844 |
| 1916 | 422,661,429 | 362,748,060 | 6,313,588 | 6,141,521 |
| 1917 | 397,025,436 | 358,104,510 | 6,321,480 | 4,917,246 |
| 1918 | 388,772,189 | 313,313,490 | 444,796 | 4,947,233 |
| 1919 | 356,496,202 | 341,226,090 | 3,967,262 | 4,903,850 |
| 1920 | 325,344,350 | 315,316,260 | 6,711,947 | 8,316,143 |
| 1921 | 332,328,727 | 317,574,360 | 8,786,013 | 6,467,754 |
| Total | 9,796,157,177 | 9,246,783,006 | 236,881,639 | 160,886,452 |

The sale by the petitioner of its products was practically confined to the smaller towns and country districts, and prior to 1908 it encountered very little competition. About the year 1908 competition became very keen, due mainly to improved methods of transportation

whereby other yeast and bakers' bread could be marketed in the smaller communities.

The distribution of samples and the replacement of stale products in the hands of dealers was continuous throughout the period from 1893 to 1921, over its entire sales territory.

Petitioner's gross sales and net profits from 1893 to 1908, inclusive, and from 1909 to 1921, inclusive, are as follows:

| Year. | Sales. | Net profits (before deducting taxes). | Year. | Sales. | Net profits (before deducting taxes). |
|---|---|---|---|---|---|
| 1893 | $450,386.06 | $133,552.71 | 1908 | $1,879,523.10 | $738,396.90 |
| 1894 | 631,617.19 | 233,240.16 | 1909 | 1,998,639.74 | 840,670.90 |
| 1895 | 641,596.19 | 250,442.78 | 1910 | 2,089,792.66 | 954,751.77 |
| 1896 | 688,602.98 | 261,876.51 | 1911 | 2,150,371.00 | 1,036,945.67 |
| 1897 | 805,736.67 | 273,055.31 | 1912 | 2,202,145.95 | 1,049,398.70 |
| 1898 | 901,166.59 | 297,403.58 | 1913 | 2,139,093.96 | 962,132.32 |
| 1899 | 1,017,334.51 | 358,918.40 | 1914 | 2,049,764.28 | 858,845.24 |
| 1900 | 1,099,151.93 | 314,021.69 | 1915 | 1,939,266.64 | 829,784.48 |
| 1901 | 1,207,898.22 | 359,951.19 | 1916 | 2,311,399.37 | 1,100,001.27 |
| 1902 | 1,302,571.79 | 374,208.53 | 1917 | 2,556,715.28 | 1,010,212.84 |
| 1903 | 1,395,990.70 | 399,124.77 | 1918 | 2,511,155.32 | 962,332.80 |
| 1904 | 1,518,586.11 | 400,118.71 | 1919 | 2,288,329.06 | 1,010,101.91 |
| 1905 | 1,590,546.53 | 416,677.58 | 1920 | 3,831,785.10 | 1,789,074.36 |
| 1906 | 1,679,528.27 | 603,806.99 | 1921 | 4,761,040.33 | 2,634,265.66 |
| 1907 | 1,780,824.39 | 636,697.56 | | | |

Petitioner expended $108,444.30 in the acquisition of the following yeast concerns: Diamond Yeast Co., McCullough Co., On Time Yeast Co., Yeast Wafer Co., Burroughs Yeast Co., and Yeast Froth Co. This amount was included in its advertising account and the parties agree that it should be included in invested capital.

One million dollars was expended for advertising prior to petitioner's incorporation and the parties agree that it should be excluded from invested capital.

#### OPINION.

STERNHAGEN : The petitioner seeks to have included in its statutory invested capital an amount of $2,734,900.31, which was expended by it prior to 1909, as shown in the findings. These expenditures, it is said, were not current expenses but were investments by the petitioner in a capital asset, which it calls its " intangible structure," made to establish and build up its business for the future, irrespective of the immediate return. The items were not capitalized in the petitioner's accounts but were written off currently through profit and loss; but petitioner attributes this to overconservative bookkeeping which it says should not preclude full consideration of the true nature of the outlay. Without going further, we adopt this view as correct, leaving it to a consideration of other facts as well as bookkeeping to determine the proper treatment of the expenditures and the taxpayer's rights under the statute.

From the evidence, most of which as to essential facts is not in dispute, we gather, and the Commissioner admits, that substantial

sums were spent by this corporation in the early period of its existence in the promotion and expansion of its business. The taxpayer argues that all of the amount in question was so spent and hence was an investment. The Commissioner urges that some part was not promotion and expansion but was the cost of maintenance and hence not invested but properly chargeable against current income. Thus it will be seen that the question becomes one of evidence of the extent to which the amount in question is to be classified and apportioned between capital and expense.

The Commissioner raises the shield of the burden of proof to defend his complete disallowance, the argument being that there can be no allocation to capital except to the extent actually proven, and since it is clear from the evidence that some uncertain part of the amount, however slight, is not capital, no allowance can be made. *Falsus in uno, falsus in omnibus.*

There can be little doubt in the minds of reasonable men fairly acquainted with modern business that promotion expenditures like those before us have a significance similar to the investment in more tangible assets. They fertilize the field for new production. The free distribution of samples at the state fair is justified only if it lures a new customer. It was not to the housewife already convinced that the petitioner planned to give away its samples of yeast year after year, but to one who would become a new unit in its expanding business. In this way it was risking new capital in the business in the hope of future profits—making an investment. Whether this investment is to be called good will or trade name or trade-mark, or something else, is unimportant. It may not need a name, except for accounting purposes, in order to reflect the expenditure and yet not ignore its investment significance.

Generally and theoretically, therefore, it is safe to say that some part of the cost of a campaign or system of promotion may be of permanent significance and may be regarded as a capital investment rather than a deductible expense. But how far in a given case the recognition of this doctrine may require the capitalization of some expenditures and the charging off of others is hard to say. Clearly, when the question is submitted for judicial consideration, it may not be answered *ab inconvenienti* by an arbitrary rule. The present case demonstrates this clearly. The petitioner during all the twenty-nine years of its life through 1921 spent amounts of similar character which it classified similarly in its accounts. These it claims were capital before 1909, although it deducted them as expense after 1908. Obviously no such distinction existed in fact, even if petitioner's alleged peak of expansion occurred in 1908. To say that before the alleged peak, when there was no tax based on

income, no part was current expense, and immediately thereafter, when taxable income could be reduced by these deductions, all of it was current expense, would require support greater than appears in the present record. The officer's statement is not convincing.

Looking alone to the years prior to 1909 covered by the claim, we find no such evidence as enables us to say with any assurance how much capital was invested and how much of the outlay was properly charged off. As to each class of expenditure the record shows the amount spent each year. Each one varied from year to year. Take, for example, the three items of agents' expenses, agents' salaries, and promotion men's salaries and expenses.

| Year. | Agents' expenses. | Agents' salaries. | Promotion men's expenses and salaries. | Year. | Agents' expenses. | Agents' salaries. | Promotion men's expenses and salaries. |
|---|---|---|---|---|---|---|---|
| 1893 | $38,758.34 | $28,422.15 | | 1901 | $2,018.56 | $11,683.36 | $121,097.09 |
| 1894 | 54,245.78 | 27,418.33 | | 1902 | 1,462.51 | 15,143.88 | 117,885.15 |
| 1895 | 69,025.98 | 34,668.73 | | 1903 | 87,342.60 | 47,732.67 | 16,267.06 |
| 1896 | 73,757.43 | 38,432.54 | $5,840.97 | 1904 | 92,130.51 | 73,829.76 | 12,675.48 |
| 1897 | 1,442.13 | 25,623.81 | 109,095.55 | 1905 | 105,442.95 | 62,637.92 | 726.13 |
| 1898 | 1,960.20 | 6,310.78 | 122,851.32 | 1906 | 88,433.45 | 57,951.07 | |
| 1899 | 4,297.45 | 33,345.93 | 91,119.76 | 1907 | 64,546.22 | 52,859.55 | |
| 1900 | 2,024.43 | 47,368.53 | 94,536.29 | 1908 | 68,183.23 | 51,301.06 | |

These wide variations lead one, in the absence of any further knowledge, to doubt that there was any consistent policy of investment or any satisfactory way of determining a fair allocation. Perhaps it would be reasonable to believe that as time went on and the business grew the proportion of capital decreased and current maintenance increased. But as to this the Board has no knowledge of the probabilities and there is no proof. It is not a matter of judicial notice, and we are not permitted to guess. If anyone has any evidence upon which an allocation can be predicated, such evidence must be produced by the petitioner. Any analysis which this Board might otherwise make of the bare figures in evidence would require assumptions that it is not our province to make.

We are therefore constrained to approve the Commissioner's disallowance notwithstanding our approval of the general contention of the petitioner's counsel that in a proper case invested capital may include a proper part of the amounts expended for promotion in the early period of a business.

The impossibility of finding the portion to be capitalized brings the case squarely within section 327, Revenue Act of 1918, and it is our opinion that an investigation should be made by the Commissioner under section 328, so that if the amount of tax paid by comparable corporations is such as to reduce the petitioner's deficiency, that may be done.

*Judgment will be entered on 15 days' notice, under Rule 50.*