T.C. Memo. 1998-252


UNITED STATES TAX COURT


RJR NABISCO INC. (FORMERLY R.J. REYNOLDS INDUSTRIES, INC.)
AND CONSOLIDATED SUBSIDIARIES, Petitioner v.
COMMISSIONER OF INTERNAL REVENUE, Respondent


Docket No. 3796-95.                    Filed July 8, 1998.

        P is the common parent of an affiliated group of
corporations making a consolidated return of income.
M1, a member of the affiliated group, claimed a
deduction pursuant to sec. 162, I.R.C., for graphic
design expenditures relating to cigarette package
designs.  M2, another member of the affiliated group,
reported a portion of an international arbitration
award that it received as an amount realized on the
sale or other disposition of property.  R determined a
deficiency in P's consolidated income tax liability,
disallowing the deduction as a sec. 162, I.R.C.,
expense and recharacterizing the graphic design
expenditures as capital expenditures.  R further
treated the disputed portion of the arbitration award
as ordinary income. <u>Held</u>:  Graphic design expenditures
for cigarette packages are advertising expenses,
deductible under sec. 162, I.R.C.  <u>Held</u>, <u>further</u>, the
disputed portion of the arbitration award is an amount
realized on the sale or other disposition of property.

Wayne S. Kaplan, William Albert Schmalzl, Thomas Kittle-Kamp, Clisson S. Rexford, and Stephen D. Katzman, for petitioner.

Kim A. Palmerino and Gary Walker, for respondent.

MEMORANDUM FINDINGS OF FACT AND OPINION

HALPERN, Judge: Petitioner is the common parent corporation of an affiliated group of corporations making a consolidated return of income (the affiliated group). By notice of deficiency dated December 15, 1994 (the notice), respondent determined a deficiency in Federal income tax for the affiliated group for its 1982 taxable (calendar) year in the amount of $9,856,982.76 along with an increased rate of interest under section 6621(c). The issues for decision are (1) the deductibility of graphic design expenditures made in connection with certain cigarette products and (2) the character of a portion of a payment received as the result of an arbitration proceeding arising from the expropriation of certain property by the Government of Kuwait.

Unless otherwise indicated, all section references are to the Internal Revenue Code in effect for the year in issue, and all Rule references are to the Tax Court Rules of Practice and Procedure.

CONTENTS

FINDINGS OF FACT................................................ 4
  I.    Introduction............................................ 4
 II.    Graphic Design Issue.................................... 4
        A.  R.J. Reynolds Tobacco Co.; Nature of the Dispute..... 4
        B.  Graphic Design; Package Design....................... 5
        C.  Reynolds' Cigarette Products......................... 5
        D.  Reynolds' Marketing Activities....................... 6
        E.  Graphic Designs...................................... 8
        F.  Advertising.......................................... 8
        G.  Longevity of Graphic Designs and Advertising
            Campaigns............................................ 9
        H.  Litigated Expenses...................................10
III.    Expropriation Issue.....................................10
        A.  American Independent Oil Co.; Nature of the Dispute..10
        B.  Events Leading to the Expropriation.................. 11
        C.  The Expropriation and the Arbitration............... 13
            1.  The Expropriation and the Agreement for
                Arbitration..................................... 13
            2.  Conduct of the Arbitration...................... 14
            3.  Questions Presented to the Tribunal............. 15
            4.  Aminoil's Claims With Respect to Expropriated
                Assets.......................................... 15
            5.  Rate of Interest; Inflation..................... 17
            6.  Final Award..................................... 17
            7.  Validity of the Expropriation................... 19
            8.  The Question of Indemnification................. 21
        D.  Petitioner's Tax Treatment of the Award............. 25
OPINION........................................................ 27
  I.    Graphic Design Issue.................................... 27
        A.  Issue................................................ 27
        B.  Arguments of the Parties............................ 27
        C.  Tax Rules Governing Advertising Expenditures........ 29
            1.  Introduction.................................... 29
            2.  Deductible Business Expenses.................... 31
            3.  Ordinary Business Advertising................... 32
        D.  Advertising Campaign Expenditures................... 39
        E.  Conclusion.......................................... 44
 II.    Expropriation Issue.................................... 46
        A.  Description of the Issue............................ 46
        B.  Arguments of the Parties............................ 47
        C.  Discussion.......................................... 48
            1.  Introduction.................................... 48
            2.  Authority To Interpret the Award................ 49
            3.  The Award Is Ambiguous.......................... 49
            4.  Extrinsic Evidence.............................. 53
            5.  Expert Testimony of Charles N. Brower........... 53
            6.  Respondent's Position........................... 58

       7.   Conclusion...................................... 59

   D.   Income Tax Consequences............................ 60

FINDINGS OF FACT

## I. Introduction

Some of the facts have been stipulated and are so found. The stipulations of facts filed by the parties, with attached exhibits, are incorporated herein by this reference.

Petitioner, a Delaware corporation, maintained its principal office in New York, New York, at the time the petition was filed.

## II. Graphic Design Issue

### A. R.J. Reynolds Tobacco Co.; Nature of the Dispute

During 1982, R.J. Reynolds Tobacco Co. (Reynolds), a New Jersey corporation, was a member of the affiliated group. During that year, Reynolds was engaged in the business of manufacturing and marketing tobacco products. Reynolds had $3.6 billion of sales in 1982 and, in reporting its income for Federal income tax purposes, claimed a deduction for graphic design and package design expenditures in the amount of $2,196,441 (the disallowed deduction). Respondent disallowed that deduction on the grounds that petitioner had failed to establish that the disallowed deduction represented an ordinary and necessary business expense or was otherwise deductible. (The principal dispute between the parties is whether the disallowed deduction is not a section 162 expense because it is a capital expenditure.)

B.  Graphic Design; Package Design

A "graphic design" (graphic design) is a combination of verbal information, styles of print, pictures or drawings, shapes, patterns, colors, spacing, and the like that make up an overall visual display.  The term "package design" (package design) refers to the design of the physical construction of a package.

C.  Reynolds' Cigarette Products

Among the tobacco products manufactured and marketed by Reynolds are cigarettes in the following product lines: Camel, Century, More, Now, Salem, Sterling, Vantage, and Winston.  A product line is distinguished by a brand name (e.g., Camel) and may contain different cigarette products (e.g., Camels, Camel Filters, and Camel Lights).  Cigarettes are packaged in either soft-packs or crush-proof boxes.

Different cigarette products have different attributes, and Reynolds can combine those attributes to make different products. Among the available attributes are: (1) name, (2) tar and nicotine content (full flavor, light, or ultra light), (3) length in millimeters (e.g., 70, 85, or 100 millimeters), (4) flavor (e.g., regular, menthol, or mint), (5) tobacco blends (flue-cured, burley, and oriental tobaccos), (6) package (soft-pack or crush-proof box), (7) circumference (regular, wide, slender, slim, or super slim), (8) filter or nonfilter, (9) quantity in a

package, (10) filter-tip type (standard, charcoal, or hard plastic), and (11) graphic designs.

In part, imagery sells cigarettes. The imagery that sells cigarettes includes imagery that projects the experience of using the product (e.g., smooth or light) and imagery that projects characteristics attractive to the targeted consumer group (e.g., masculine or sociable). Such imagery significantly influences consumers' decisions about which brand to smoke. Other products for which imagery is a substantial factor in consumers' purchasing decisions include perfume, automobiles, and alcoholic beverages. Such products are often described as "image" products.

The cigarette package is particularly important in selling cigarettes because (1) some cigarette products differ little or not at all in their physical attributes and are distinguished primarily or entirely by the imagery associated with them and (2) the smoker and those around the smoker see the package numerous times a day.

D. <u>Reynolds' Marketing Activities</u>

Reynolds regularly and continuously engages in marketing activities with respect to its cigarette products. Reynolds proceeds in three broad steps to accomplish its marketing activities: (1) determining product position, (2) developing a

marketing strategy, and (3) deciding on the tactics to implement the marketing strategy.

For a cigarette product, determining product position is the most important step. It involves determining the overall concept of what the product is intended to offer and the segment of smokers to whom the product is intended to appeal.

After determining a product's intended position, Reynolds develops a marketing strategy to achieve that position. The basic elements of a marketing strategy for a cigarette product include: (1) choosing the product's name, (2) determining the desired physical characteristics of the product (e.g., the tobacco blend and whether the cigarette will have a filter tip), (3) developing graphic and package designs, (4) determining an appropriate price, (5) developing an advertising campaign, and (6) developing appropriate promotions.

Finally, Reynolds employs specific tactics to implement the marketing strategy. Those tactics include: (1) developing executions for the advertising campaign (i.e., the specific, individual advertisements that implement the theme or themes of the campaign), (2) determining in which media to advertise, and (3) selecting product promotions (e.g., "in-store" promotions, discounts and coupons, direct mail promotions, and event marketing).

With respect to each cigarette product, all of the activities constituting Reynolds' marketing strategy and implementation tactics are part of a coordinated effort to convey the intended image and achieve the intended positioning for the product.

E.  Graphic Designs

Graphic designs are developed for the following components of a cigarette product: cartons, packages, flags (messages temporarily applied to cartons or packages, e.g., "New!"), tipping (the printed wrap around the filter), cigarette papers (which hold the tobacco), foils (the inner lining between the cigarettes and soft-pack or box), and, for soft packs, a closure seal (across the top of the package).  The graphic designs for a product serve, among other things, to identify the product, convey information, and attract attention at the point of sale when the retailer displays the pack.

F.  Advertising

The advertising for a product serves to convey information, project the image chosen for the positioning of the product, and attract consumer attention.

The advertising strategy for a product entails the development of the following components:

(1)  Creation of the advertising "campaign", which, along with other marketing efforts, projects the image or message

chosen to achieve the intended positioning through consistent visual imagery;

(2) Creation of advertising "executions", which are the specific individual advertisements that implement the theme or themes of the campaign; and

(3) Determination of "media placement", which involves the selection of the appropriate media forums for placement of the individual advertising executions, such as magazines, newspapers, billboards, and in-store ("point of sale") displays.

During the period a campaign is running, a company customarily uses a number of executions in order to maintain consumer interest in the campaign. A company also may alter media placements of the executions while a campaign runs.

G. Longevity of Graphic Designs and Advertising Campaigns

At the time graphic designs or advertising campaigns are introduced, no one can determine how long the graphic designs, advertising campaigns, or elements of such designs or campaigns will be used, including whether or not they will be used for more or less than a single year. Numerous advertising campaigns, advertising campaign slogans, and advertising characters (e.g., the Maytag repairman) have lasted for more than a single year. Companies may use identical advertising executions for more than a single year. For example, television commercials for Budweiser beer featuring Clydesdale horses and Norelco shavers featuring Santa Claus run annually during the yearend holiday season and three commercials from the "Dr. Mom" campaign for Robitussin

cough syrup aired for between 4 and 8 years. Portions of one advertising execution may be used in later executions of the same or different campaigns. For example, E.F. Hutton ran advertisements in 1979, 1980, and 1982, that all contained the line: "When E.F. Hutton talks, people listen."

H. Litigated Expenses

The parties have identified a portion of the disallowed deduction as the "litigated expenses" (litigated expenses). The parties wish us to decide the deductibility of the litigated expenses. They then will use our decision as a basis to settle their disagreement with respect to the remaining disallowed deductions. The litigated expenses total $1,804,029 and relate to the product lines described in supra at section II.C.

III. Expropriation Issue

A. American Independent Oil Co.; Nature of the Dispute

During 1982, American Independent Oil Co. (Aminoil), a Delaware corporation, was a member of the affiliated group. Aminoil had been in the business of exploring for, producing, refining, and selling crude oil and other natural resources outside of the United States. From 1948 until 1977, Aminoil enjoyed a concession to explore for and exploit oil, gas, and other natural resources in an area on the frontier of Kuwait. In

1977, the Government of Kuwait[1] terminated the concession and expropriated certain property of Aminoil.  Aminoil disputed the termination and expropriation, and that dispute, along with certain of Kuwait's claims, was submitted to arbitration.  The arbitrators reached a decision that resolved Aminoil's and Kuwait's competing claims, and the arbitrators awarded Aminoil $179,750,764.  In arriving at that sum, the arbitrators included $55,147,935 as a "level of inflation" adjustment.  (We must determine whether the so-called "level of inflation" adjustment is an amount realized on the sale or other disposition of any of the property expropriated by Kuwait.)

B.   Events Leading to the Expropriation

By an agreement entered into on June 28, 1948, Kuwait granted Aminoil the concession to explore for and exploit crude oil, natural gas, and other natural resources in the Kuwaiti section of an area on the frontier between Kuwait and Saudi Arabia then known as the "Neutral Zone" and later known as the "Divided Zone".  (Hereafter, the term "concession agreement" refers to the agreement entered into on June 28, 1948 (including its subsequent amendments), the term "concession" refers to the concession obtained by Aminoil pursuant to the concession

_____

[1]   Hereafter, we will use the term "Kuwait" to refer to the Government of Kuwait except where the context indicates that we are referring to the geographical area comprising the country of Kuwait.

agreement, and the term "Neutral Zone" refers both to the Neutral Zone and the Divided Zone.)

The concession agreement authorized Aminoil, at its own expense, to construct and operate power stations, refineries, pipelines, and other facilities necessary to the conduct of its activities in the Neutral Zone and gave Aminoil exclusive ownership of all petroleum and natural gas that it extracted.  In consideration of its rights under the concession agreement, Aminoil agreed to make a lump-sum payment to Kuwait and to pay annual royalties.

The concession agreement was to remain in effect until June 28, 2008, unless earlier terminated for cause.  Upon termination, all of Aminoil's real and personal property in Kuwait and the Neutral Zone would pass to Kuwait free of charge.

On various occasions, Aminoil's financial obligations to Kuwait under the concession agreement were renegotiated (to include the imposition of an obligation to pay Kuwait income taxes).  In late 1975, Kuwait announced that it intended to apply to Aminoil a 1974 Organization of Petroleum Exporting Countries (OPEC) resolution known as the "Abu Dhabi Formula" (Abu Dhabi Formula).  The Abu Dhabi Formula would have substantially raised Aminoil's royalty and tax obligations to Kuwait.  Aminoil objected to the imposition of the Abu Dhabi Formula, and negotiations between Aminoil and Kuwait followed, which lasted until some time in 1977.

C.  The Expropriation and the Arbitration

1.  The Expropriation and the Agreement for Arbitration

On September 19, 1977, Kuwait terminated the concession and expropriated all of Aminoil's properties and assets in Kuwait and the Neutral Zone (the expropriation date and the expropriation, respectively).  Aminoil protested the expropriation.  The expropriation was also of concern to the Government of the United States, and, on October 27, 1977, at a meeting in Kuwait, the Secretary of the Treasury of the United States, W. Michael Blumenthal, discussed the expropriation with Kuwait's Minister of Finance.  Secretary Blumenthal expressed the hope that Aminoil would receive full and fair compensation from Kuwait. Subsequently, representatives of the U.S. Department of State encouraged Kuwait to agree to an arbitration proceeding.  On July 23, 1979, Aminoil and Kuwait entered into an agreement (the arbitration agreement) providing for an arbitration (the arbitration) of various differences and disagreements relating to the concession agreement and the expropriation.[2]  The arbitration agreement established a tribunal of three members to hear and decide the dispute (the tribunal and the dispute, respectively). The three members of the tribunal were (1) Sir Gerald G. Fitzmaurice, Q.C., from the United Kingdom, appointed by Aminoil,

---

[2]     Hereafter, we shall use the term "parties" to refer to Aminoil and Kuwait, as parties to the arbitration agreement, except where the context indicates that we are referring to petitioner and respondent as parties to this proceeding.

(2) Professor Hamed Sultan, from Egypt, appointed by Kuwait, and

(3) Professor Paul Reuter, president of the tribunal, professor of law at the University of Paris, appointed by the president of the International Court of Justice. All three members of the tribunal are now deceased. The arbitration agreement reflects the parties' recognition that it would be impracticable to restore them to their respective positions prior to the expropriation. Article III of the arbitration agreement empowers the tribunal to decide:

(1) The amount of compensation, if any, payable by Kuwait to Aminoil in respect of the assets acquired by Kuwait pursuant to the expropriation;

(2) The amount of damages, if any, payable by Kuwait to Aminoil in respect of the termination of the concession agreement;

(3) The amount payable by one party to the other under the concession agreement in respect of royalties, taxes, or other obligations; and

(4) The amount of interest, if any, payable by either party to the other, the rate of such interest, and the date from which such interest shall be payable.

The arbitration agreement provides that the seat of the arbitration shall be Paris.

## 2. Conduct of the Arbitration

The arbitration was conducted similarly to a judicial proceeding. The tribunal established procedural rules; the parties submitted combined pleadings and briefs (called "Memorials", "Counter-Memorials", and "Replies"); the tribunal

received documentary evidence and expert reports, and the tribunal heard witnesses and received oral argument.  The tribunal's procedures provided for hearings, to be conducted in two stages, with the second devoted to "quantum".  Eventually, however, the tribunal found the quantum stage to be unnecessary, and it never occurred.

### 3.  Questions Presented to the Tribunal

Among the questions presented to the tribunal were the following:  (1) Whether the expropriation constituted a breach of the concession agreement by Kuwait and, therefore, was an unlawful taking under public international law, (2) whether Aminoil's reparation should be measured by the public international law standard for a lawful expropriation or by the higher public international law standard for an unlawful expropriation, and (3) whether Aminoil's reparation should include compensation for its concession as measured by the profits Aminoil lost as a result of the premature termination of the concession agreement.  Other questions presented to the tribunal included the question of whether any interest was due either party, as provided for by the arbitration agreement, and questions relating to Kuwait's counterclaims against Aminoil for royalties, taxes, and other asserted liabilities.

The question of whether the expropriation was lawful or unlawful was important for Aminoil because it believed that,

under public international law, if the expropriation were unlawful, it would be entitled to be recompensed for any increase in the value of its assets between the expropriation date and the date of any award.

4. <u>Aminoil's Claims With Respect to Expropriated Assets</u>

As recompense for its assets other than the concession, Aminoil sought to recover the amounts of money and other current assets taken and, with respect to its fixed assets, their depreciated replacement value. Aminoil claimed that Kuwait had expropriated money and other current assets with a total value of $30,356,000. Aminoil claimed $2,587,136,000 of lost profits, calculated on a 1980 present value basis. Recognizing that the concession agreement would have required it to transfer its fixed assets to Kuwait free of charge upon the concession's natural termination on June 28, 2008, Aminoil sought no payment for its fixed assets in the event the tribunal awarded it compensation for the concession measured by profits lost for the entire period through the natural termination date. Aminoil sought recovery for its fixed assets only if the tribunal measured the lost profits attributable to the concession through some date prior to 2008, in which case Aminoil demanded to be paid for the fixed assets' depreciated replacement value as of that sooner date. Aminoil presented the tribunal with an expert valuation report finding that the depreciated replacement value of the fixed assets on the expropriation date was $185,305,000.

With respect to Aminoil's claims for recompense for its assets, Kuwait argued that the only proper measure of compensation for any of Aminoil's assets was book value. Kuwait's position reflected the stated policy of OPEC that compensation to Western oil companies should be based exclusively on book value and that any other basis for compensation, including, in particular, any measure of lost profits, should be refused. The parties submitted a joint report to the tribunal (the joint report) that showed unagreed amounts for book values as follows:

| Assets | Aminoil's Position (in thousands) | Kuwait's Position (in thousands) |
|--------|-----------------------------------|----------------------------------|
| Fixed assets | $10,619 | $8,610 |
| Other assets | 31,857 | 28,075 |
| Total | $42,476 | $36,685 |

### 5. Rate of Interest; Inflation

With respect to the interest that was to be determined by the tribunal, only Aminoil suggested any specific rates of interest. Kuwait proposed only that the interest rate be an "appropriate rate". Aminoil suggested the following rates of interest:

| | |
|------|--------|
| 1973 | 7.90% |
| 1974 | 8.43% |
| 1975 | 7.21% |
| 1976 | 5.23% |
| 1977 | 7.39% |
| 1978 | 11.16% |
| 1979 | 13.17% |

Other than their respective requests for interest, neither party asked the tribunal to award it any compensation for the delayed payment of its claimed damages. Neither party asked the tribunal to make a separate award based upon "inflation".

6. Final Award

The arbitration agreement provided for a "final award" (the award). The tribunal issued a document constituting the award on March 24, 1982. The award consists of eight sections and is 139 pages in length. The eighth section is entitled "OPERATIVE SECTION (DISPOSITIF)" (operative section), and provides as follow:

> For these reasons,
>
> THE TRIBUNAL, unanimously, having regard to all of the above mentioned considerations,
>
> AWARDS to Aminoil,
>
> THE SUM OF ONE HUNDRED AND SEVENTY NINE MILLION, SEVEN HUNDRED AND FIFTY THOUSAND, SEVEN HUNDRED AND SIXTY FOUR UNITED STATES DOLLARS ($179,750,764) calculated on the basis of being payable on 1 July, 1982.

Kuwait honored the amount of the award and paid $179,750,764 to Aminoil on July 1, 1982 (the $179 million payment).

The body of the award preceding the operative section sets forth the reasoning of the tribunal. The first section reviews the procedural setting of the arbitration and summarizes the claims of the parties. The second section sets forth the facts of the case. The third section determines the applicable law,

which, as to the substantive issues in dispute, the tribunal concludes to be established public international law (which the tribunal concludes is part of the law of Kuwait). The fourth section analyzes certain of the contractual obligations of the parties' and concludes that (1) in light of negotiations between the parties preceding the expropriation, some amount is owing to Kuwait from Aminoil on account of past profits received by Aminoil in excess "of what would have constituted a reasonable rate of return" to Aminoil and (2) within the framework of a general settlement of the consequences of the expropriation, the tribunal has jurisdiction to determine such amount due to Kuwait. The fifth section addresses the validity (lawfulness) of the expropriation and is described <u>infra</u> at section II.C.7. The sixth section deals with certain miscellaneous counterclaims by Kuwait against Aminoil. The seventh section is captioned "The Question of Indemnification" and sets forth the tribunal's resolution of Kuwait's claims against Aminoil and Aminoil's claims against Kuwait and is described in <u>infra</u> at section III.C.8.

       7.  <u>Validity of the Expropriation</u>

In the fifth section of the award (section five), the tribunal begins its discussion of the validity of the expropriation by recognizing that the question of validity "lies at the core of the present litigation." The tribunal did not have difficulty in disposing of the parties' various arguments

except for Aminoil's contention relying on the "stabilization clauses" of the concession agreement (the stabilization clauses). Introducing the tribunal's analysis of the stabilization clauses, section five states:

> Nevertheless, Aminoil's concessionary contract contained specific provisions in the light of which it may be queried whether the nationalisation was in truth lawful.

The stabilization clauses are set forth in section five as follows:

> The period of this Agreement shall be sixty (60) years from the date of signature.

> \* \* \* \* \*

> The Sheikh shall not by general or special legislation or by administrative measures or by any other act whatever annul this Agreement except as provided in Article 11. No alteration shall be made in the terms of this agreement by either the Sheikh or the Company except in the event the Sheikh or the Company jointly agreeing that it is desirable in the interest of both parties to make certain alterations, deletions or additions to this agreement.

> \* \* \* \* \*

> [Article 11(b)] Save as aforesaid this Agreement shall not be terminated before the expiration of the period specified in Article 1 thereof except by surrender as provided in Article 12 or if the Company shall be in default under the arbitration provisions of Article 18.

Section five continues: "A straightforward and direct reading of them [the stabilization clauses] can lead to the conclusion that they prohibit any nationalisation." Nevertheless, the tribunal concluded that the expropriation was valid, based on the following grounds: (1) The stabilization clauses do not prohibit nationalization in so many words, (2) a stabilization clause

could be fully effective only for a period shorter than the 60-year term of the concession agreement, and (3) the stabilization clauses had lost much of their force through changes in the relations between the parties since 1948. Thus, section five provides: "a lawful nationalisation of Aminoil's undertaking had occurred."

The tribunal's analysis and conclusion with respect to the stabilization clauses was not unanimous. Sir Gerald G. Fitzmaurice disagreed with the majority's analysis of the stabilization clauses. He concluded that the expropriation was irreconcilable with the stabilization clauses. Despite that conclusion, however, Judge Fitzmaurice noted his "entire agreement with the Operational Part (Dispositif) of the Award", i.e., the bottom line, net compensation awarded to Aminoil of $179,750,764.

### 8. The Question of Indemnification

The tribunal's discussion of indemnification in the seventh section of the award (section seven) is divided into two parts, the first dealing with "Principles and Methods" and the second determining amounts due.

The tribunal begins the first part by recognizing that there is "a very considerable gap" between Aminoil's claim, based on the lost profits value of the concession, and Kuwait's offer, based on net book value of the assets expropriated. Section seven identifies "appropriate compensation" as the applicable

legal standard and recognizes that its task calls for a "concrete interpretation" of that standard. Section seven states that a determination of appropriate compensation "is better carried out by means of an enquiry into all the circumstances relevant to the particular concrete case, than through abstract theoretical discussion." Section seven recognizes that, in applying that standard to the case before it, "there is no room for rules of compensation that would make nonsense of foreign investment." The tribunal adds: "Compensation then, must be calculated on a basis such as to warrant the upkeep of a flow of investment in the future."

Considering in that light the circumstances of the case before it, the tribunal decided that the "legitimate expectations" of the parties must be the basis for deciding on compensation. The tribunal rejected the notion that Aminoil's legitimate expectations were to be measured by the then-present value of the projected net revenues it might have anticipated over the remaining 30 years of the concession agreement, finding, instead, that "the Parties adopted a different conception in the course of their relations and negotiations, - namely that of the reasonable rate of return. This it is, therefore, that must guide the Tribunal."

The tribunal then focused more precisely on "the basis on which the evaluation of the legitimate expectations of Aminoil must proceed." Section seven provides: "whereas the contract of

concession did not forbid nationalisation, the stabilization clauses * * * were nevertheless not devoid of all consequence, for they prohibited any measures that would have had a confiscatory character"; they, therefore, "created for the concessionaire a legitimate expectation that must be taken into account."  The tribunal reiterated, too, that from "the time when its rate of production reached a satisfactory level, Aminoil was in the position of an undertaking whose aim was to obtain a 'reasonable rate of return' and not speculative profits which, in practice, it never did realize."  The tribunal stated further that "over the years, Aminoil had come to accept the principle of a moderate estimate of profits, and * * *  it was this that constituted its legitimate expectation."  Concluding, the tribunal stated:

> [The Tribunal] considers it to be just and reasonable
> to take some measure of account of all the elements of
> an undertaking.  This leads to a separate appraisal of
> the value, on the one hand of the undertaking itself,
> as a source of profit, and on the other of the totality
> of the assets, and adding together the results
> obtained.

The tribunal concluded its discussion of principles and methods by stating that it "is necessary in all cases to consider the value of the assets as at the date of transfer, taking due account of the depreciation they have undergone by reason of wear and tear and obsolescence."  For reasons explained at length in the Award, the tribunal rejected the net book values Kuwait sought.

Finally, the tribunal turned to the amounts due.  It began that discussion by acknowledging that the joint report was the source of certain agreed amounts.  It stated that, where the parties disagreed in the joint report, it adopted an average of the parties' amounts.  It stated that, where it did not possess any joint report figures, it determined for itself other necessary amounts.  The tribunal then proceeded to "determine the balance-sheet of the financial rights and obligations of the Parties as at 19 September, 1977."  It dealt first with Kuwait's claims against Aminoil and determined that Aminoil owed Kuwait $123,041,000.  In the final paragraph of section seven (paragraph 178), the tribunal fixed Aminoil's claims against Kuwait and set forth certain adjustments, including the $123,041,000 owed by Aminoil to Kuwait, to obtain the basis for the $179 million payment to be made by Kuwait to Aminoil.  In full, paragraph 178 provides:

Amounts due to Aminoil -

(1)  These are made up of the values of the various components of the undertaking separately considered, and of the undertaking itself considered as an organic totality - or going concern - therefore as a unified whole, the value of which is greater than that of its component parts, and which must also take account of the legitimate expectations of the owners. These principles remain good even if the undertaking was due to revert, free of cost, to the concessionary Authority in another 30 years, the profits having been restricted to a reasonable level.

(2)  As regards the evaluation of the different concrete components that constitute the undertaking, the Joint Report furnishes acceptable indications

concerning the assets other than fixed assets. But as regards the fixed assets, the "net book value" used as a basis merely gives a formal accounting figure which, in the present case, cannot be considered adequate.

(3) For the purposes of the present case, and for the fixed assets, it is a depreciated replacement value that seems appropriate. In consequence, taking that basis for the fixed assets, taking the order of value indicated in the Joint Report for the non-fixed assets, and taking into account the legitimate expectations of the concessionaire, the Tribunal comes to the conclusion that, at the date of 19 September, 1977, a sum estimated at $206,041,000 represented the reasonably appraised value of what constituted the object of the takeover.

(4) According to the above mentioned data, the sum total of the amount due to Aminoil as at 19 September, 1977, comes to $206,041,000 less the liabilities of $123,041,000, that is to say $83,000,000. This represents the outcome of the balance-sheet of the rights and obligations of the Parties as at 19 September, 1977.

(5) In order to establish what is due in 1982, account must be taken both of a reasonable rate of interest, which could be put at 7.5%, and of a level of inflation which the Tribunal fixes at an overall rate of 10%, - that is to say at a total annual increase of 17.5% in the amount due, over the amount due for the preceding year.

(6) Capitalizing the above-mentioned figure of $83,000,000 at a compound rate of 17.5% annually, gives the amount specified in the Operative Section (Dispositif) below.

D.  Petitioner's Tax Treatment of the Award

Petitioner took the award into account in determining the consolidated Federal income tax liability of the affiliated group for 1982. Petitioner identified the various components giving rise to the $179 million payment and made the following allocations:

```
Amounts received by Aminoil
under paragraph 178(3):
  Oil Inventory           $10,885,500
  Other Assets             19,080,500
  Fixed Assets            176,075,000
      Subtotal                          206,041,000

Less Aminoil's liabilities to
Kuwait:
  Per concession agreement 32,228,500
  Per Abu Dhabi Formula    71,963,000
  Due third parties        18,849,500
      Subtotal                          123,041,000
              Total                                     83,000,000
Plus Amounts received by Am-
inoil under paragraph 178(5):
  7.5% component           41,602,829
  10.0% component          55,147,935
      Subtotal                                          96,750,764
Payment received from Kuwait                           179,750,764
```

Petitioner reported the $55,147,935 identified as the "10% Component" (and by the Tribunal as the "level of inflation" adjustment) as an amount realized on a sale or other disposition of the concession. Since petitioner believed that Aminoil's adjusted basis in the concession was zero, petitioner reported a gain of $55,147,935. Petitioner reported that gain as a long-term capital gain under the authority of section 1231.

Respondent determined a deficiency in petitioner's consolidated income tax liability for 1982 based, in part, on an adjustment treating the "level of inflation" adjustment not as an amount realized on the sale or disposition of property but, rather, as ordinary income.

OPINION

I. Graphic Design Issue

A. Issue

We must determine whether the litigated expenses are currently deductible business expenses. Respondent determined that they are capital expenditures and, therefore, not currently deductible. The litigated expenses include expenditures relating to the graphic design of cigarette packaging materials (cartons, soft-packs, and crush-proof boxes) and cigarette papers, tips, and other components of the cigarette product, as well as a relatively small amount of expenditures relating to package design (the physical construction of the package itself).

B. Arguments of the Parties

Petitioner starts with the premise that expenditures for ordinary business advertising (to sell a product or service or for institutional or "goodwill" advertising that keeps the taxpayer's name before the public) are deductible under section 162(a) and argues that the litigated expenses give rise to a benefit that is indistinguishable from the benefit derived from ordinary business advertising. Consequently, petitioner argues, the litigated expenses are also deductible under section 162(a). Petitioner also argues that, like expenditures for ordinary business advertising, the litigated expenses represent a

recurring, day-to-day business expense, deductible under section 162(a) for that reason alone.  In the alternative, petitioner argues that the litigated expenses are deductible under section 174.

Respondent agrees that the litigated expenses are similar to some expenditures for ordinary business advertising, but he argues that not all expenditures for ordinary business advertising are deductible under section 162(a).  Respondent distinguishes between the costs of developing advertising campaigns (advertising campaign expenditures) and the costs of executing those campaigns by way of, for instance, the production of television commercials (advertising execution expenditures). Respondent argues that advertising execution expenditures generally give rise to expenses deductible under section 162 (deductible business expenses) but that advertising campaign expenditures do not.  Respondent sees a "decisive difference" between advertising campaign expenditures and advertising execution expenditures in that the former give rise only to long-term benefits while the latter give rise principally to short-term benefits.  Respondent analogizes the litigated expenses to advertising campaign expenses and argues that the litigated expenses provide an intangible benefit to Reynolds over the economic lives of the brands to which they attach.  Consequently, respondent concludes that the litigated expenses must be

capitalized and are not currently deductible business expenses.[3]

Respondent also argues that the litigated expenses are neither recurring, day-to-day expenditures nor are they deductible under section 174.

C.   Tax Rules Governing Advertising Expenditures

1.   Introduction

Petitioner's principal claim is that "graphic design and advertising activities are indistinguishable in any way that would justify their inconsistent tax treatment".  Petitioner supports its claim that graphic design and advertising are indistinguishable by analyzing and comparing the functions of those activities.  Respondent attempts to counter petitioner's functional analysis with a functional analysis of his own, candidly conceding, however, that his disagreement with petitioner "is only a matter of degree".[4]  Neither party argues

---

[3]   Respondent argues that the litigated expenses are allocable to particular brands and, as so allocated, give rise to an economic benefit for the remaining life of that brand. Accordingly, respondent does not believe that the litigated expenses have a determinable useful life, and respondent would allow no depreciation deduction for the litigated expenses.  We need not address the question of a depreciation deduction because petitioner stands on its claim that the litigated expenses are deductible business expenses in 1982, and has not argued in the alternative for capitalization and a depreciation deduction in 1982.

[4]   Indeed, the parties have stipulated similar, in part identical, functions for graphic design and advertising.  Compare (1) "The graphic designs for a product serve to identify the

(continued...)

that the term "advertising" is a term of art for Federal income tax purposes. Indeed, respondent implicitly concedes that the rules with respect to advertising govern the deductibility of the litigated expenses, although, under respondent's interpretation of those rules, the litigated expenses are not deductible business expenses because they are capital expenses. Moreover, respondent called as an expert witness Mukesh Bajaj, Ph.D., senior associate, Business Valuation Services, Inc. Dr. Bajaj was accepted by the Court as an expert in corporate finance and business valuation, and his written report was received into evidence as his expert testimony. Dr. Bajaj testified that there is an accepted textbook definition of advertising.[5] On cross-examination, he conceded that cigarette package graphic designs qualify as advertising under that definition. On brief, respondent agrees that cigarette pack graphic designs fit the textbook definition of advertising. We are, thus, satisfied

---

[4] (...continued)
product, convey information, attract attention at point of sale when the retailer displays the pack, and other purposes.", with (2) "The advertising for a product or group of products serves to convey information, project the image chosen for the positioning of the product or products, attract consumer attention to the product or products, and other purposes."

[5] Dr. Bajaj testified that the accepted, current textbook definition of advertising is the 1948 definition of the American Marketing Association, which he summarized as follows: "any paid form of non-personal presentation and promotion of ideas, goods, or services by an identified sponsor, which involves the use of mass media." (Emphasis omitted.)

that, on the evidence before us, petitioner has proven that the litigated expenses are advertising expenditures, and we so find.

## 2. Deductible Business Expenses

Section 162(a) allows as a deduction "all the ordinary and necessary expenses paid or incurred during the taxable year in carrying on any trade or business".  Generally, no deduction is allowed for any capital expenditure.  Compare sec. 179 with sec. 263(a)(1).[6]  The Supreme Court has held that a taxpayer's expenditure that "serves to create or enhance * * * a separate and distinct" asset must be capitalized.  Commissioner v. Lincoln Sav. & Loan Association, 403 U.S. 345, 354 (1971).  Subsequently, the Court held that, although the separate-or-distinct-asset standard is a sufficient condition for capitalization, it is not a necessary condition and that an expenditure that gives rise to more than incidental future benefits, whether or not the expenditure gives rise to a separate and distinct asset, may require capitalization.  INDOPCO, Inc. v. Commissioner, 503 U.S. 79, 87 (1992).

---

[6]    In certain circumstances, capital expenditures may be recovered by deductions taken over the useful life of the resulting property or over some other predetermined period. See, e.g., secs. 167, 197 (as added by the Omnibus Budget Reconciliation Act of 1993, Pub. L. 103-66, sec. 13261(a), 107 Stat. 313, 532, effective generally for property acquired after Aug. 10, 1993).  We are not here concerned with any such recovery.  See supra n.3.

Although the mere presence of an incidental future benefit--"some future aspect"--may not warrant capitalization, a taxpayer's realization of benefits beyond the year in which the expenditure is incurred is undeniably important in determining whether the appropriate tax treatment is immediate deduction or capitalization.  * * *

Id. (emphasis added).  We have characterized the inquiry as to whether an expenditure may be deducted under section 162(a) or must be capitalized as "an inquiry into the proper time to give tax effect to the expenditure."  A.E. Staley Manufacturing Co. v. Commissioner, 105 T.C. 166, 193, revd. and remanded 119 F.3d 482 (7th Cir. 1997).  In A.E. Staley Manufacturing Co., we stated that the inquiry is "fact specific", and we described the general nature of the inquiry as follows:

Assuming that the expenditure is ordinary and necessary in the operation of the taxpayer's business, the answer to the question of whether the expenditure is a deduction allowable as a business expense must be determined from the nature of the expenditure itself which in turn depends on the extent and permanence of the work accomplished by the expenditure.

Id. at 193-194 (quoting 6 Mertens, Law of Federal Income Taxation, sec. 25.37, at 118 (1992 rev.).

3.  Ordinary Business Advertising

"Advertising" is commonly defined as:  "The activity of attracting public attention to a product or business, as by paid announcements in print or on the air."  The American Heritage

Dictionary of the English Language 26 (3d ed. 1992).[7]  A business
may advertise principally to attract customers, and there is no
doubt that such advertising may contribute to the goodwill
enjoyed by the business.  "Goodwill", the Supreme Court stated,
"is the expectancy of continued patronage".  <u>Newark Morning
Ledger Co. v. United States</u>, 507 U.S. 546, 555-556 (1993) ("the
shorthand description of good-will as the expectancy of continued
patronage * * * provides a useful label with which to identify
the total of all the imponderable qualities that attract
customers to the business" (internal quotation marks and
citations omitted)).  Thus, if an expenditure for ordinary
business advertising gives rise to goodwill, then, at least in
theory, the proper time to give tax effect to the expenditure may
be a period running beyond the taxable year of expenditure.
Nevertheless, the regulations interpreting section 162 include
"advertising and other selling expenses" among the class of
deductible business expenses:

> Business expenses deductible from gross income include
> the ordinary and necessary expenditures directly
> connected with or pertaining to the taxpayer's trade or
> business * * *  Among the items included in business
> expenses are * * * advertising and other selling
> expenses * * *

---

[7]   We see no pertinent difference between this definition and
the "textbook" definition testified to by Dr. Bajaj.  See <u>supra</u>
n.5.

Section 1.162-1(a), Income Tax Regs.  The regulations do not further describe the nature of those advertising and selling expenses (hereafter, without distinction, advertising expenses) that are deductible business expenses, although section 1.162-20(a)(2), Income Tax Regs., provides that expenditures for institutional or "goodwill" advertising that keeps the taxpayer's name before the public are generally deductible business expenses "provided the expenditures are related to the patronage the taxpayer might reasonably expect in the future."  The regulations, thus, suggest that expenditures for ordinary business advertising are not subject to the usual inquiry when it comes to the question of the proper time to give tax effect to such an expenditure.

Sections 1.162-1(a) and 20(a)(2), Income Tax Regs., however predates INDOPCO, Inc. v. Commissioner, supra at 87, in which the Supreme Court concluded that significant future benefits were "undeniably important" in making the capitalization inquiry.  See also FMR Corp. & Subs. v. Commissioner, 110 T.C. ___ (1998) (slip op. at 39).  Subsequently, the Commissioner ruled that INDOPCO, Inc. does not affect the treatment of advertising expenditures under section 162(a).  In pertinent part, Rev. Rul. 92-80, 1992-2 C.B. 57, provides:

> The Indopco decision does not affect the treatment of advertising costs under section 162(a) of the Code. These costs are generally deductible under that section

even though advertising may have some future effect on business activities, as in the case of institutional or goodwill advertising. See section 1.162-1(a) and section 1.162-20(a)(2) of the regulations. Only in the unusual circumstance where advertising is directed towards obtaining future benefits significantly beyond those traditionally associated with ordinary product advertising or with institutional or goodwill advertising, must the costs of that advertising be capitalized. See, e.g., Cleveland Electric Illuminating Co. v. United States, 7 Cl. Ct. 220 (1975) (capitalization of advertising costs incurred to allay public opposition to the granting of a license to construct a nuclear power plant).

Although Rev. Rul. 92-80, supra, may raise some question of just what benefits are traditionally associated with ordinary product advertising or with institutional or goodwill advertising, there is no doubt that such traditional benefits include not only patronage but also the expectancy of patronage (i.e., "goodwill"). Compare sec. 1.162-1(a), Income Tax Regs. (deductible business expenses include "advertising and other selling expenses"), with sec. 1.162-20(a)(2), Income Tax Regs. (same as to institutional or goodwill advertising "provided the expenditures are related to the patronage the taxpayer might reasonably expect in the future"). Thus, even if advertising is directed solely at future patronage or goodwill (i.e., ordinary business advertising), Rev. Rul. 92-80, supra, indicates that normally the costs are deductible.

The unusual treatment of expenditures for ordinary business advertising manifest in Rev. Rul. 92-80, supra, is longstanding.

Its genesis is in efforts by taxpayers in the early years of income taxation to capitalize the costs of large-scale advertising campaigns and to amortize the capitalized amounts over a period of years, efforts that were consistently opposed by the Commissioner on the ground that allocating advertising expenditures between current expenses and capital outlays was not feasible.  See, e.g., Northwestern Yeast Co. v. Commissioner, 5 B.T.A. 232, 237 (1926).  Although the courts did not entirely foreclose the propriety of capitalizing some advertising expenditures, taxpayers found it difficult to prove an appropriate allocation between current and long-term benefits. In time, this insistence on evidence hardened into a rule of law that capitalization is proper only if the taxpayer can establish "that the future benefits can be determined precisely and are not of indefinite duration."  A. Finkenberg's Sons, Inc. v. Commissioner, 17 T.C. 973, 982-983 (1951); see also E.H. Sheldon & Co. v. Commissioner, 214 F.2d 655, 659 (6th Cir. 1954) (taxpayer must show "with reasonable certainty the benefits resulting in later years from the expenditure"), affg. in part, and revg. and remanding in part 19 T.C. 481 (1952).  See the discussion of advertising expenses in Bittker & Lokken, Federal Taxation of Income, Estates and Gifts, par. 20.4.5 at 20-86 to 20-88 (2d ed. 1989).  But see Durovic v. Commissioner, 542 F.2d 1328 (7th Cir. 1976) (cost of free samples must be capitalized;

amortization denied in absence of proof of limited life), affg. 65 T.C. 480 (1975).

Although the case law admits the possibility of allocation between the short- and long-term benefits of advertising expenditures and, thus, would provide a basis for the Commissioner to insist that a taxpayer prove the portion of his advertising expenditures allocable to current benefits, the authorities previously cited, section 1.162-20(a)(2), Income Tax Regs., and Rev. Rul. 92-80, supra, establish that the Secretary and the Commissioner, respectively, have eschewed that approach with respect to ordinary business advertising, even if long-term benefits (e.g., goodwill) are the taxpayer's primary objective. See also Rev. Rul. 68-561, 1968-2 C.B. 117 (concerning a gas company's campaign to increase consumption by encouraging the construction of "all gas" homes and the conversion of existing homes to gas and distinguishing between cash allowances to builders and homeowners, which must be capitalized because the expected benefit is increased sales of gas beyond the year of expenditure, and direct advertising costs of the sales campaign, which may be treated as ordinary business expenses because "less directly and significantly productive of intangible assets having a value extending beyond the taxable years in which they were paid or incurred").

The result, as a practical matter, is that, notwithstanding certain long-term benefits, expenditures for ordinary business advertising are ordinary business expenses if the taxpayer can show a sufficient connection between the expenditure and the taxpayer's business.  See Burrous v. Commissioner, T.C. Memo. 1977-364 (taxpayer failed to prove a proximate relationship between midget auto racing and any increase in his accounting business).  The only significant exceptions are that (1) expenditures for foreign-based broadcast advertising to the United States are disallowed if a like deduction is not allowed by the foreign country for United States based broadcast advertising to that country and (2) expenditures to advertise in a political party's convention program and certain other political publications cannot be deducted.  Secs. 162(j), 276(a)(1), respectively.[8]  Generally, expenditures for billboards, signs, and other tangible assets associated with advertising remain subject to the usual rules with respect to capitalization.  See, e.g., Best Lock Corp. v. Commissioner,

_____

[8]  Sec. 162(j) was added by the Trade and Tariff Act of 1984, Pub. L. 98-573, sec. 232(a), 98 Stat. 2991, and is effective for taxable years beginning after Oct. 30, 1984.  Under a provision now repealed, taxpayers who elected to capitalize advertising expenditures in computing their liability under the now defunct wartime excise profits taxes had to follow a consistent practice for subsequent expenditures.  Sec. 263(b) (repealed by the Omnibus Budget Reconciliation Act of 1990, Pub. L. 101-508, sec. 11801(a)(16), 104 Stat. 1388-520); sec. 1.162-14, Income Tax Regs.

31 T.C. 1217, 1235 (1959) ("The amounts paid in 1951 and 1952 to produce * * * [a sales catalog] were capital items contributing to earning income for several years in the future and not ordinary and necessary expenses of doing business in 1951 and 1952."); Alabama Coca-Cola Bottling Co. v. Commissioner, T.C. Memo. 1969-123 (costs of signs, clocks, and scoreboards, having a useful life of 5 years not deductible business expense). But see E.H. Sheldon & Co. v. Commissioner, 214 F.2d 655, 659 (6th Cir. 1954), (expenditures to produce sales catalog likely to be used for several years deductible business expense) supra at 659.

D. Advertising Campaign Expenditures

Respondent would have us distinguish between the creation of an advertising campaign and the execution of that campaign:

> A marketing [advertising] campaign does not sell anything. It prescribes a long-term intangible marketing concept, its imagery, its theme, and its slogan and/or message. That marketing concept is then portrayed in advertisements with ever-changing art work to maintain customer interest in the campaign. * * *

Respondent argues that advertising campaign expenditures are not deductible business expenses because: "The cost of developing a successful marketing campaign is expected to generate benefits for future indefinite business operations." To respondent, advertising campaign expenditures are distinguishable from advertising execution expenditures on the basis that the former are solely long-term oriented, and that is a "decisive difference" foreclosing an immediate deduction.

It is clear, however, that to distinguish advertising campaign expenditures from advertising execution expenditures solely on the basis of the taxpayer's expectations regarding the duration of the expected benefits is insufficient to require capitalization of an advertising expenditure.  See sec. 1.162-1(a), 20(a)(2) (providing for the general deductibility of "goodwill" advertising); supra sec. I.C.3.  So long as all of the benefits resulting from advertising campaign expenditures are among the traditional benefits associated with ordinary business advertising, the regulations, as interpreted by respondent's own ruling, Rev. Rul. 92-80, 1992-2 C.B. 57, preclude capitalization.

Nevertheless, respondent argues that advertising campaign expenditures (and, likewise, the litigated expenses) create intangible assets and benefits that are not among the benefits traditionally associated with ordinary business advertising (e.g., goodwill).  Respondent describes those benefits of advertising campaign expenditures as certain "legal rights and economic interests" of a long-term nature.  Respondent identifies the pertinent legal rights as the Federal statutory rights and common-law trademark rights that attach to "trade dress", a term that the courts have used to describe, "essentially * * * [the] total image and overall appearance" of a product.  See Philip Morris Inc. v. Star Tobacco Corp., 879 F. Supp. 379, 383 (S.D.N.Y. 1995), and authorities cited therein.  Respondent

identifies the economic interests that are benefited by the litigated expenses as the various brands of cigarettes to which the litigated expenses pertain. Respondent adopts the term "brand equity" to define the economic value inherent in a successful brand. Dr. Bajaj testified as to the major elements of brand equity: (1) brand name awareness, (2) brand loyalty, (3) perceived quality, and (4) brand association. He describes those elements as follows:

> Brand name awareness comes from advertising, as well as from previous use or from word or mouth. Brand loyalty is primarily a result of being satisfied with the product from prior use. Perceived quality has two main elements: (1) a user understands the product and has an opinion on its quality, [and] (2) advertising and package design can create a "personality" for the product. For example, Mercedes cars are considered luxurious, while Volvo cars are considered safe. * * * Finally, brand associations can be about imagery created through advertising or other means. * * *

Dr. Bajaj is of the opinion that the litigated expenses "created intangible assets that are inseparable from brand equity and goodwill".

Petitioner does not dispute that (1) advertising campaign expenditures (or expenditures for graphic design) may contribute to trade dress or (2) trade dress is protected by law. Petitioner points out, however, that trade dress is in fact also a product of ordinary business advertising, including what respondent labels as advertising executions. See id. ("A product's image may be created by words, symbols, collections of

colors and designs, or <u>advertising materials or techniques</u>"
(internal quotation marks omitted; emphasis added.)).  Petitioner
argues that, in <u>Philip Morris, Inc. v. Star Tobacco Corp.</u>, <u>supra</u>,
the image and overall appearance of the Marlboro brand that
Philip Morris sought to protect by its trade dress infringement
action was, in substantial part, its advertising executions:

> The trade dress Philip Morris seeks to protect consists
> of specific manifestations of a Western motif:  the
> picture of a cowboy on a cigarette pack; figures of
> cowboys who have come over time to be known as the
> "Marlboro Man"; and those evocative stretches of the
> Western landscape, not to be found on any map or
> ordinance survey, called "Marlboro Country."  * * *

<u>Id.</u> at 385.  Petitioner points out that the parties have
stipulated that, with respect to Philip Morris' "Come to Marlboro
Country" campaign:  "The campaign is characterized by a masculine
cowboy image in a rugged western setting.  The <u>individual
executions</u> show the cowboy in various settings -- roping a steer,
riding a horse into the sunset, etc."  Petitioner further cites
other trade dress cases holding that a variety of other marketing
materials and techniques are subject to trade dress protection.
See <u>Computer Care v. Serv. Sys. Enters., Inc.</u>, 982 F.2d 1063,
1065-1071 (7th Cir. 1992); <u>Original Appalachian Artworks, Inc. v.
Toy Loft, Inc.</u>, 684 F.2d 821, 831 (11th Cir. 1982); <u>Chuck Blore &
Don Richman, Inc. v. 20/20 Adver., Inc.</u>, 674 F. Supp. 671, 680-
681 (D. Minn. 1987).  We agree with petitioner's analysis and
conclude that <u>both</u> advertising campaign expenditures <u>and</u>

advertising execution expenditures account for at least some of the value of the typical trade dress. Since advertising execution expenditures are ordinary business expenses, we conclude that the long-term benefit associated with trade dress is a benefit traditionally associated with ordinary business advertising. It therefore cannot serve as a basis to require the capitalization of the litigated expenses.

In connection with his discussion of trade dress, respondent refers to the copyright and trademark protection available to the various elements making up trade dress. The parties have stipulated, however, that Reynolds placed notices of copyright on its advertising executions, and exhibits in evidence establish that other companies did the same. Thus, we conclude that copyright protection afforded to copyrightable advertising materials is a traditional benefit associated with ordinary business advertising, and, for that reason, it cannot serve as the basis for requiring the capitalization of the litigated expenses.

With respect to trademark protection, the parties have stipulated that none of the litigated expenses were incurred in connection with the purchase, creation, acquisition, protection, expansion, registration, or defense of a trademark or trade name.

As to the economic interests of Reynolds benefited by the litigated expenses, petitioner agrees with respondent's expert,

Dr. Bajaj, that the litigated expenses created intangible assets that are inseparable from brand equity and goodwill. Indeed, petitioner argues: "[T]he record uniformly shows that successful graphic designs, together with successful advertising and other marketing activities, combine to build an overall brand value or equity -- the marketing terms for goodwill." Petitioner argues that, nevertheless, the litigated expenses are deductible. We agree. We think that "brand equity", as described by Dr. Bajaj, represents "goodwill", as we understand that term (i.e., "the expectancy of continued patronage"). See supra sec. I.C.3. That being the case, and goodwill clearly being a traditional benefit associated with ordinary business advertising, we must conclude that the litigated expenses are not capital expenditures simply because they contribute to brand equity.

E. Conclusion

We have found that the litigated expenses are advertising expenditures.[9] Respondent classifies the litigated expenses as advertising campaign expenditures and would have us distinguish between such expenditures and advertising execution expenditures on the basis that the latter give rise principally to short-term

---

[9] Neither party has asked us to address separately the small portion (approximately 1.5 percent) of the litigated expenses that were package design expenditures. Indeed, it is only petitioner that, in its opening brief, drew our attention to the distinction between graphic design and package design, see Findings of Fact, supra sec. II.B., and respondent has not alleged that we should afford them different treatment.

benefits while the former give rise only to long-term benefits. The experience of our predecessor, the Board of Tax Appeals, and other courts in an earlier era lead us to doubt the sharpness of that distinction.[10]  Moreover, no case distinguishes between advertising execution and campaign expenditures, and the long-term, short-term distinction respondent would draw is incompatible with section 1.162-1(a) and 20(a)(2), Income Tax Regs., and Rev. Rul. 92-80, 1992-2 C.B. 57.  Respondent's distinction will not hold; the litigated expenses are advertising expenditures that are ordinary business expenses.

Because we have concluded that the litigated expenses are ordinary business expenses on the grounds stated, we need not address petitioner's alternative theories that the litigated expenses are recurring expenses or are deductible under section 174.

---

[10]    See, e.g., Northwestern Yeast Co. v. Commissioner, 5 B.T.A. 232, 237 (1926), discussed supra sec. I.C.3., and quoted in part as follows:

> Generally and theoretically, therefore, it is safe to say that some part of the cost of a campaign or system of promotion may be of permanent significance and may be regarded as a capital investment rather than a deductible expense. But how far in a given case the recognition of this doctrine may require the capitalization of some expenditures and the charging off of others is hard to say.  Clearly, when the question is submitted for judicial consideration, it may not be answered ab inconvenienti by an arbitrary rule.

II.  Expropriation Issue

    A.  Description of the Issue

On September 19, 1977, Kuwait terminated the concession enjoyed by Aminoil to explore for and exploit certain natural resources in a Kuwaiti frontier area known as the Neutral Zone and expropriated certain of Aminoil's assets in Kuwait.  Aminoil protested the termination of the concession and the expropriation, and Aminoil and Kuwait entered into an agreement to arbitrate the resulting dispute.  A tribunal was established to carry out that arbitration, and, on March 24, 1982, the tribunal made an award to Aminoil in the amount of $179,750,764. Kuwait honored the decision of the tribunal and paid Aminoil the award on July 1, 1982 (the $179 million payment).  The reasoning of the tribunal precedes its statement of the amount of the award and indicates that the tribunal reached that amount by steps. First, the tribunal determined the sum of Aminoil's debts to Kuwait and the sum of certain amounts due Aminoil from Kuwait. The difference of those two sums was a net amount in Aminoil's favor.  The tribunal then determined the total amount due Aminoil by adding to the subtotal it had determined (1) an interest amount and (2) an amount described as a "level of inflation" amount (10 percent of the amount due compounded from the expropriation date to the date of the award).  For purposes of taking the award into account for Federal income tax purposes,

petitioner made allocations based on the methodology of the tribunal.  Petitioner then determined what income tax consequence to assign to each of those allocations and reported those consequences accordingly.  Respondent agrees with petitioner's allocations and with all but one of the consequences determined by petitioner.  Petitioner treated $55,147,935, the amount described by the tribunal as the "level of inflation" adjustment, as an amount realized on the sale or other disposition of the concession.  Respondent does not agree with petitioner that the "level of inflation" adjustment is an amount realized on the sale or other disposition of the concession (which would give rise to a long-term capital gain in an equal amount).  Respondent believes that the "level of inflation" adjustment (the disputed item) is ordinary income in the nature of interest.  As the parties have framed the issue, we must determine whether the disputed item is as petitioner describes it or is as respondent describes it.

B.  Arguments of the Parties

Petitioner's argument is as follows:

> Petitioners contend that the unexplained 10% "inflation" factor [the disputed item] is taxable as capital gain under section 1231 because it represented disguised compensation for Kuwait's premature termination of Aminoil's Concession, for which there is no identifiable compensation on the face of the Award.

Respondent's argument is as follows:

The [tribunal determined that the] value of Aminoil's nationalized operations on September 19, 1977 was $83,000,000, net of liabilities owing from Aminoil to Kuwait (i.e., $206,041,000 less $123,041,000). The five year delay in payment (from September 19, 1977 through July 1, 1982) caused Kuwait to accrue substantial additional debt owing to Aminoil. Had there been no delay in payment, Kuwait would have simply paid Aminoil $83,000,000. The "inflation" factor, like the "interest" factor, was compensation for the delay in payment, and therefore, it is properly treated as ordinary income under section 61.

C. Discussion

1. Introduction

The parties agree that the disputed item was received pursuant to the award and that the intention of the tribunal governs as to whether the disputed item is disguised compensation for the concession or a payment in the nature of interest. Respondent argues that the award is clear on its face and that the disputed item is in the nature of interest. Respondent argues further that we are constrained, in any event, by the Convention on the Recognition and Enforcement of Foreign Arbitral Awards of June 10, 1958 (the Convention), 21 U.S.T. 2517, (entered into force Dec. 29, 1970), from "reevaluat[ing] the matters decided by the Tribunal". We shall first determine whether the Convention constrains us from interpreting the award. Since we believe that it does not, we shall then consider whether the award is ambiguous. Since we believe that it is, we shall interpret it, using the tools at our disposal. As will be seen, we agree with petitioner's interpretation of the award.

### 2. Authority To Interpret the Award

The award results from the decision of the tribunal, which came into being and obtained jurisdiction from the arbitration agreement. Pursuant to the Convention, the United States must recognize the award as binding and make its courts available for enforcement of the award. See Article II of the Convention; 21 U.S.T. 2519. We are not, however, considering an action to enforce the award, nor are we, in any way, determining the rights of the parties to the award inter se. This is a proceeding to redetermine an income tax deficiency, and, with respect to the award, our inquiry is limited to the meaning of certain words petitioner claims are ambiguous. The Convention neither precludes our inquiry into whether the award is ambiguous, nor, if we find it to be ambiguous, from interpreting it. Respondent has advanced no reason other than the Convention as to why we should refrain from considering whether the award is ambiguous; since we are not persuaded by respondent's Convention argument, we shall consider whether the award is ambiguous.

### 3. The Award Is Ambiguous

The tribunal awarded Aminoil $179,750,764, an amount that the tribunal reached by a process of calculation. The majority of the award sets forth the premises and reasoning of the tribunal leading to that calculation. We shall consider those

premises and reasoning, in light of the arbitration agreement, in determining whether the award is ambiguous as it pertains to the disputed item. We find that it is.

We find most persuasive the seventh section of the award, in which the tribunal first addressed "Principles and Methods" of indemnification and determined that Aminoil must be compensated for its "legitimate expectations" of a "reasonable rate of return" from its terminated concession. The tribunal specifically included as a principle upon which to base the compensation due Aminoil that some measure of account must be taken of "all" of the elements of Aminoil's undertaking. That led the tribunal to conclude: "This leads to a separate appraisal of the value, on the one hand of the undertaking itself, as a source of profit, and on the other of the totality of the assets, and adding together the results obtained." In the tribunal's introduction to its discussion of "Amounts due to Aminoil" (paragraph 178), the tribunal further indicates that an amount is due Aminoil for the value of the concession measured by projected loss of future profits:

> These ["Amounts due to Aminoil"] are made up of the values of the various components of the undertaking separately considered, and of the undertaking itself considered as an organic totality - or going concern - therefore as a unified whole, the value of which is greater than that of its component parts, and which must also take account of the legitimate expectations of the owners. These principles remain good even if the undertaking was due to revert, free of cost, to the

concessionairy Authority in another 30 years, the
profits having been restricted to a reasonable level.

In its final statement on the subject, the tribunal ruled that:

taking that basis ["depreciated replacement value"] for
the fixed assets, taking the order of value indicated
in the Joint Report for the non-fixed assets, and
taking into account the legitimate expectations of the
concessionaire, the Tribunal comes to the conclusion
that, as the date of 19 September, 1977, a sum
estimated at $206,041,000 represented the reasonably
appraised value of what constituted the object of the
takeover.

Since $206,041,000 (exclusive of the compounded 10 percent "level

of inflation" the tribunal added to it) is itself less than the

sum of $185,305,000 (the only figure before the tribunal for the

depreciated replacement value of the fixed assets) and

$29,966,000 (the average value of the non-fixed assets provided

by Aminoil and Kuwait), there is an unresolved tension between

those numbers and the tribunal's statement that it is also

compensating Aminoil for its "legitimate expectations" of a

"reasonable rate of return" from its terminated concession.  That

leads us to believe that the award is ambiguous.

We are also led to believe that the award is ambiguous

because of the limited jurisdiction of the tribunal.  The

tribunal was limited by Article III of the arbitration agreement

to granting Aminoil (apart from any amounts "in respect of

royalties, taxes or other obligations," none of which were

granted Aminoil) (1) "compensation * * * in respect of assets",

(2) "damages * * *  in respect of termination [of the concession

agreement], and (3) "interest".  As a matter of interpretation, therefore, the tribunal's provision in the award of the compound 10-percent per annum "level of inflation" must fall within one or another of those categories or be outside of the tribunal's scope of authority.  We have no reason to believe that the tribunal acted outside of the scope of its authority, and we reject that possibility.  Moreover, language in paragraph 178 of the award ("Amounts due to Aminoil") indicates that the disputed item is not within the category of interest.  In subparagraph (5) of paragraph 178, the tribunal expressly differentiates between "a reasonable rate of interest, which could be put at 7.5%," and "a level of inflation which the Tribunal fixes at an overall rate of 10%," which suggests that (1) the tribunal considered "interest" and "the level of inflation" to be separate items and (2) the latter, therefore, must be either "compensation" or "damages".

The tribunal's reasoning is, thus, ambiguous as to how it came to measure the amount of compensation owing to Aminoil and whether the tribunal might have taken into account any value measured by the potential of the concession to generate profits. Petitioner's argument that the tribunal's compensation did include an element of compensation measured by loss of future profit in a disguised way--specifically, through the "level of inflation"--is plausible.  In contrast, respondent failed to persuade us that the award is clear on its face or that the

disputed amount, necessarily, is in the nature of interest.  We find that the award is ambiguous with respect to the disputed item.

### 4.  Extrinsic Evidence

Since we cannot resolve the ambiguity with respect to the disputed item from the terms of the award (or the arbitration agreement, from which it springs), we must turn to extrinsic evidence to determine its meaning.  Cf. North W. Life Assurance Co. v. Commissioner, 107 T.C. 363, 382 (1996) (with respect to the language of a treaty, "when language is susceptible to differing interpretations, extrinsic materials bearing on the parties' intent should be considered."); Woods v. Commissioner, 92 T.C. 776, 780 (1989) (similar, with respect to a consent extending time to assess tax); Church v. Commissioner, 80 T.C. 1104, 1107 (1983) (evidence extrinsic to jury verdict considered to determine nature of monetary award); Johnston v. Commissioner, 42 T.C. 880, 882 (1964) (history of lump-sum condemnation award considered to determine allocation of proceeds).

### 5.  Expert Testimony of Charles N. Brower

Petitioner argues that the award is ambiguous with respect to the disputed item because the tribunal used the disputed item to disguise its award to Aminoil of compensation for Kuwait's premature termination of the concession.  Petitioner relies principally on the expert testimony of Charles N. Brower to prove

that point.  By experience, Mr. Brower is knowledgeable concerning legal issues involving compensation for expropriation under public international law and the practice of international arbitration involving such disputes.[11]  Mr. Brower was accepted by the Court as an expert witness.  The Court found Mr. Brower's testimony to be forthright and credible.

Mr. Brower has an opinion as to the compatibility of the tribunal's reasoning with international law.  He believes that it is impossible to determine from the face of the award whether or not the tribunal's award of compensation to Aminoil is consistent with relevant principles of public international law (which was the law applied by the tribunal).  He is of the opinion that the tribunal's award of compensation to Aminoil would in fact be consistent with such principles, however, <u>if, but only if</u>, the "level of inflation", "for which there was no precedent

---

[11]    Mr. Brower's credentials are impressive:  During the period 1969-1973 he served in the U.S. Department of State, successively as assistant legal adviser for European affairs, deputy legal adviser, and acting legal adviser.  In that last position, he was the principal international lawyer for the Government of the United States in addition to being the chief lawyer for the Secretary of State and the U.S. Department of State.  He was responsible for both the pursuit and defense of international claims involving the Unites States.  From 1984 to 1988, he served full-time as a judge of the Iran-U.S. Claims Tribunal in the Hague.  He is currently in private practice as a member of the law firm of White & Case.  He serves by designation of the United States as a member of the Register of Experts of the United Nations Compensation Commission in Geneva, as well as serving on the Secretary of State's Advisory Committee on Public International Law.

whatsoever in international law", is regarded as compensation to Aminoil for expropriation of the concession, "which otherwise would have extended for 30 years into the future."  He bases that latter conclusion on three assumptions: (1) the tribunal did not exceed its authority; (2) because the tribunal held the expropriation to be lawful, international law required compensation for the "value of the undertaking", which includes both a value for the fixed and non-fixed assets taken and a value for the concession rights; and, (3) the nominal compensation recited by the tribunal represents only the sum of the depreciated replacement value of the fixed assets and the accepted value of the non-fixed assets.  Mr. Brower's reasoning leading to his third assumption is the same as our reasoning leading to our conclusion that there is an "unresolved tension" between the tribunal's numbers and its representations concerning compensation for Aminoil's "legitimate expectations".  See supra sec. III.B.4.  Mr. Brower concludes:  "Thus, the Tribunal could not within the range of $206,041,000 have granted both the undisputed value of the expropriated assets and have awarded anything in respect of the concession.  Only the 'level of inflation' could have done that."

Mr. Brower is also of the opinion that the tribunal's "studied opacity" with respect to any element of the awards being measured by loss of profits is consistent with relevant practices

in international arbitration cases. In short, he believes that political considerations may have played a significant part in the tribunal's choice of language. Mr. Brower believes that international arbitral tribunals choose their language carefully to insure that both parties will honor the award, particularly in disputes involving sovereign states, which may hinder enforcement by invoking the doctrine of sovereign immunity. In particular, Mr. Brower believes that arbitrators called upon to rule on allegations of unlawful actions by a sovereign conventionally exhibit a certain sensitivity to the political framework within which the case arises. He believes that sovereign states invariably and vigorously resist accusations of unlawfulness, not only because of the higher compensation a finding of unlawfulness might entail but also, and more importantly, because no government wishes to be branded before the world as having acted unlawfully, particularly if it wishes to encourage future foreign investment. Mr. Brower has examined the award and believes that it provides "abundant evidence" of the tribunal's "attention to pragmatic and political concerns". He surmises that Kuwait would not have wanted any award of compensation either to state explicitly or to suggest impliedly, by its evident amount or by its nature, unlawfulness. Mr. Brower states:

> In particular, Kuwait would have wished to avoid an award which, even while finding it acted lawfully, appeared to grant compensation reflecting the value of what was expropriated at the time of the award (instead

>of on the date of expropriation [the former being a
>consequence of an unlawful expropriation]), or a value
>measured to any degree by loss of profit, or both,
>because the former is consistent only with unlawfulness
>and the later may suggest it (particularly to Kuwait).
>* * *

Mr. Brower also believes that other factors would have influenced Kuwait to avoid any explicit compensation for lost profits. Among those factors were (1) American involvement in encouraging Kuwait into the arbitration and (2) OPEC's stated policy that compensation to Western oil companies should be based only on book value and that any other basis for compensation, including, in particular, any valuation measured by lost profit, should be refused. He believes that Kuwait would have been reluctant to agree openly to an award inconsistent with OPEC's policy, particularly against a background of what other states important to Kuwait might have characterized as "American pressure."

Mr. Brower also takes note of the separate opinion of Judge Fitzmaurice, who agreed with the operative section (which consists only of the actual award of a lump sum of $179,750,764), while, at the same time, finding that the expropriation was irreconcilable with the stabilization clauses and thus, Mr. Brower concludes, unlawful. Mr. Brower concludes that Judge Fitzmaurice agreed with the operative section because, in his view, it constituted proper compensation for an unlawful expropriation.

Taking all of the above into consideration, Mr. Brower is of the opinion that the tribunal reached a compromise (in part to obtain unanimity) whereby it (1) found Kuwait to have acted lawfully, notwithstanding that, doctrinally, that finding was highly questionable; and (2) structured the compensation so that it would not, on its face, reflect either (A) a value as of the date of the award or (B) any value measured by loss of profit; but (3) supplied such compensation de facto, in both respects, in a manner that would not be obvious, viz, by providing for the "level of inflation" adjustment.

6.  Respondent's Position

Respondent's position is that extrinsic evidence is unnecessary:

> The basic problem with petitioner's argument is that it is based on factual claims which directly contradict the text of the Award.  * * *  The Award does not state or imply that the Tribunal used the inflation factor to "disguise" a particular type of compensation, and there is simply no reason to find otherwise.  * * *

We have, however, found that the award is ambiguous, and we have considered extrinsic evidence, viz, Mr. Brower's expert testimony.  Respondent neither called any witness to rebut Mr. Brower nor discredited his testimony by cross-examination. On brief, respondent attempts to rebut Mr. Brower's conclusion that the tribunal could not, within the range of $206,041,000 (the amount stated in section 3 of paragraph 178), have granted

compensation for the undisputed value of the expropriated assets and have awarded anything in respect of the concession. Respondent attaches to his brief a table (the table) purporting to show that the going concern value of Aminoil on the expropriation date did not exceed $206,041,000. Respondent attempts to make that showing by a series of present value calculations. There are clear errors of mathematics in the table, and we fail to understand certain of respondent's assumptions. Also, we agree with petitioner that respondent may have been too conservative in extending pre-expropriation profits to post-expropriation years since the tribunal called for a post-expropriation rate of return "somewhat more liberal" than appropriate for the pre-expropriation period.

    7. Conclusion

    The parties agree that the intention of the tribunal governs as to whether the disputed item is disguised compensation for the concession or a payment in the nature of interest. Respondent argues:

> The 'inflation' factor, like the 'interest' factor, was compensation for the delay in payment, and therefore, it is properly treated as ordinary income under section 61. * * *
>
>          *          *          *          *          *
>
> The law is well settled that, amounts awarded for delay in payment constitute ordinary income under section 61. Kieselbach v. Commissioner, 317 U.S. 399, 402-405 (1943); Tiefenbrunn v. Commissioner, 74 T.C. 1566 (1980); Smith v. Commissioner, 59 T.C. 107 (1972).

\* \* \*

Respondent is correct that amounts awarded for delay in payment in connection with government takings constitute ordinary income. Petitioner, however, has set forth a plausible interpretation of the award that contradicts respondent's assumption that the tribunal intended by the disputed amount to award Aminoil for a delay in payment. Moreover, principally by Mr. Brower's testimony, petitioner has convinced us that the disputed item is not compensation for a delay in payment but, rather, is a disguised payment for Kuwait's premature termination of the concession, and we so find.

D. Income Tax Consequences

Although we have found that the disputed amount was intended by the tribunal as recompense for the concession, that does not fully resolve the tax consequences attending its receipt. Petitioner reported the disputed item as an amount realized on the sale or other disposition of the concession. Since petitioner believed that Aminoil's adjusted basis in the concession was zero, petitioner reported a gain of $55,147,935. Petitioner reported that gain as a long-term capital gain under the authority of section 1231. Petitioner reported interest of $41,602,829, which reflected the "reasonable rate of interest, which could be put at 7.5 percent" provided for in paragraph 178 (the 7.5-percent interest payment). In support of its claim that

the disputed amount was a disguised payment for the concession, petitioner argues that the 7.5-percent interest payment was a "sufficient" payment for tax purposes.  Petitioner states that, if the $179 million payment were regarded simply as an undifferentiated lump-sum payment for property ("which", petitioner argues, "strictly speaking, it is"), "the amount of interest included in the lump sum would be determined, for tax purposes, by section 483."  Petitioner states that the applicable section 483 rate was 7 percent a year compounded semiannually, which, petitioner claims, is below the interest rate that gives rise to the 7.5-percent interest payment.  Thus, petitioner concludes, "the interest income attributable to the Award's 7.5% rate, which petitioners reported in their 1982 return * * * , was more than sufficient to meet the standard of section 483."

Section 483 imputes interest (unstated interest) to a contract for the sale or exchange of property for which there is inadequate stated interest.  Section 1.483-1(b)(1), Income Tax Regs., provides:  "The term 'sale or exchange' includes any transaction treated as a sale or exchange for purposes of the Code."  Condemnation proceedings are treated as sales for Federal income tax purposes.  See Hawaiian Gas Prods., Ltd. v. Commissioner, 126 F.2d 4 (9th Cir. 1942), affg. 43 B.T.A. 655 (1941); cf. Helvering v. Hammel, 311 U.S. 504 (1941).  Apparently, petitioner accepts that section 483 applies to the

$179 million payment.  We believe that petitioner may be mistaken in concluding that the $179 million payment does not consist of any unstated interest.  It appears that, in concluding that the 7.5-percent interest payment constitutes an adequate amount of stated interest, petitioner overlooked the fact that the 7.5 percent interest amount was calculated on the basis of a principal amount that did not include the disputed item.  The parties are directed to consult on that point and on the effect of the various allocations petitioner made (and respondent accepted) in reporting the award in order to determine whether there is adequate stated interest.  If the parties can resolve the unstated interest issue, that resolution shall be reflected in the Rule 155 calculation.  If the parties cannot resolve that issue, they shall report that status to the Court so that the Court may determine the appropriate action.

Except as may be necessary to reflect unstated interest, petitioner is sustained in reporting the disputed item as a long-term capital gain, and respondent's determination of a deficiency in tax is not sustained to that extent.

<u>Decision will be entered under Rule 155</u>.