T.C. Memo. 2007-272

UNITED STATES TAX COURT

VITAMIN VILLAGE, INC., Petitioner v.
COMMISSIONER OF INTERNAL REVENUE, Respondent

Docket No. 8745-02.                    Filed September 12, 2007.

Daniel L. Reeves (officer), for petitioner.

Wesley F. McNamara, for respondent.

MEMORANDUM FINDINGS OF FACT AND OPINION

HAINES, Judge:  Respondent determined deficiencies in
petitioner's Federal corporate income tax for the fiscal years
ending (FYE) June 30, 1995 and 1996 (fiscal years at issue), of
$562,967 and $502,786, respectively.[1]

_____

[1] Unless otherwise indicated, all section references are to
                                        (continued...)

After concessions,[2] the issues for decision are: (1) Whether the amounts paid to petitioner's sole executive and shareholder during the fiscal years at issue constituted reasonable compensation under section 162(a)(1); (2) whether petitioner is entitled to deduct advertising expenses under section 162(a) of $1,105,276 for FYE June 30, 1996; and (3) whether petitioner is entitled to depreciate costs incurred in constructing a houseboat, a floating garage, and a dock under section 167(a)(1) during the fiscal years at issue.

FINDINGS OF FACT

The parties' stipulation of facts and the attached exhibits are incorporated herein by this reference, and the facts stipulated are so found. At the time the petition was filed, petitioner maintained its business office in Wilsonville, Oregon.

A. Petitioner's Business History

Petitioner was incorporated by Daniel L. Reeves in the State of Oregon in 1979.[3] Petitioner, an accrual basis taxpayer with

---

[1](...continued)
the Internal Revenue Code, as amended, and Rule references are to the Tax Court Rules of Practice and Procedure. Amounts are rounded to the nearest dollar.

[2] At trial, respondent conceded that petitioner was entitled to deduct a net operating loss of $320,845 in FYE June 30, 1996, carried back from its FYE June 30, 1998. On brief, petitioner conceded it failed to report interest income of $11,516 in FYE June 30, 1996.

[3] Mr. Reeves originally founded petitioner with two other
(continued...)

an FYE June 30, was in the business of producing, distributing, and selling skin care products, tanning lotions, diet aids, sports performance products, nutritional supplements, health food products, and apparel at both the retail and wholesale levels. Petitioner also provided indoor tanning salon services and its own printing, advertising, and marketing services. Petitioner used the business names of Vitamin Village for the production and sales of nutritional supplements, health food, skin care products, and tanning lotions; Club Tan for its tanning salon services; and Universal Graphics for its advertising, marketing, and printing activities.

Mr. Reeves was petitioner's president from 1979 and its secretary, treasurer, and sole shareholder from 1986 through the fiscal years at issue, and he controlled all aspects of petitioner's corporate operations. From 1979 through the fiscal years at issue, Mr. Reeves also performed all of petitioner's managerial duties. He worked more than 80 hours per week managing petitioner's research, development, production, sales, marketing, and advertising and supervised petitioner's employees, including making all hiring and firing decisions.

---

[3](...continued)
individuals, Jeff O'Brien and R. Gail Reeves. Mr. O'Brien left petitioner shortly after its incorporation. R. Gail Reeves terminated her positions as petitioner's secretary and treasurer, and all stock she owned in petitioner was redeemed in FYE June 30, 1986.

B.   Spinoff Corporations

To reduce petitioner's potential liability and to increase efficiency and growth, Mr. Reeves organized two new corporations out of petitioner, Club Tan Centers of Oregon, Inc. (CTC), and Universal Marketing, Inc. (UMI).  In December 1994, petitioner transferred the assets used by Club Tan to CTC, and on June 1, 1995, petitioner transferred the assets used by Universal Graphics to UMI.  All of the stock issued by CTC and UMI was transferred to Mr. Reeves in a section 355 reorganization (spinoff) resulting in petitioner, CTC, and UMI becoming brother-sister corporations.

Mr. Reeves was the president, secretary, treasurer, and sole shareholder of CTC and UMI.  Although his obligations to petitioner decreased as a result of the spinoffs, as the sole officer and manager of three corporations, Mr. Reeves had significantly increased responsibilities.

C.    Petitioner's Financial Condition

For FYE June 30, 1985 through 1996, petitioner's gross receipts, net income, and net margin were as follows:[4]

| FY | Gross receipts | Net income | Net margin (percent) |
|------|------------|-----------|-----------|
| 1985 | $471,720 | $21,938 | 4.7 |
| 1986 | 496,367 | 2,614 | 0.5 |
| 1987 | 628,333 | (26,344) | -4.2 |
| 1988 | 749,595 | 3,363 | 0.4 |
| 1989 | 1,044,449 | (49,205) | -4.7 |
| 1990 | 752,702 | (5,281) | -0.7 |
| 1991 | 661,928 | (46,254) | -7.0 |
| 1992 | 1,011,083 | 7,078 | 0.7 |
| 1993 | 2,074,682 | 43,360 | 2.1 |
| 1994 | 1,936,476 | 49,545 | 2.6 |
| 1995 | 12,501,980 | 1,087,759 | 8.7 |
| 1996 | 5,709,686 | 398,585 | 7.0 |
| 1997 | 2,170,205 | 31,985 | 1.5 |

During the fiscal years at issue, petitioner's sales, costs of goods sold, gross profits, net income, total taxes, net income per books, and ratios of gross profit to gross receipts, expressed as percentages, were as follows:[5]

---

[4] The stated gross receipts and net income (taxable income) for FYE June 30, 1985 through 1997, were obtained from petitioner's Forms 1120, U.S. Corporation Income Tax Return, for the respective fiscal years.

[5] The amounts listed in this table were reported in petitioner's Forms 1120 for the respective fiscal years at issue. Net income per books was reported on Forms 1120, Schedule M-1.

|                        | FY 1995      | FY 1996     |
|------------------------|-------------:|------------:|
| Gross receipts         | $12,501,980  | $5,709,686  |
| Cost of goods sold     | 6,128,126    | 1,473,083   |
| Gross profits          | 6,373,854    | 4,236,603   |
| Net income             | 1,087,759    | 398,858     |
| Total tax              | 300,374      | 123,769     |
| Net income per books   | 742,910      | 268,326     |
| Ratio of gross profits to gross receipts | 51% | 74% |

Petitioner reported the following shareholder equity during the years at issue:[6]

|                        | FY 1995   | FY 1996     |
|------------------------|----------:|------------:|
| Common stock           | $2,770    | $2,770      |
| Retained earnings      | 793,574   | 1,061,900   |
| Equity                 | 796,344   | 1,064,670   |
| Net income per books   | 742,910   | 268,326     |
| Return on equity       | 93%       | 25%         |

---

[6] Petitioner's common stock value and retained earnings were reported on its Forms 1120, Schedules L for the fiscal years at issue.

Because of the spinoffs, the value of petitioner's common stock was reduced from $3,000 to $2,770.

Petitioner's equity was computed by adding petitioner's end-of-year common stock value to its end-of-year retained earnings. Rate of return on equity is computed by dividing petitioner's net income per books by its equity for the respective fiscal years at issue.

D.   Petitioner's Employee Compensation

The compensation petitioner paid Mr. Reeves each year from 1982 through 1996 was:[7]

| FYE June 30 | Compensation |
|---|---|
| 1982 | $15,707 |
| 1983 | 16,100 |
| 1984 | 26,000 |
| 1985 | 42,000 |
| 1986 | 47,000 (includes $18,240 bonus) |
| 1987 | 11,000 |
| 1988 | -0- |
| 1989 | 22,444 |
| 1990 | 4,000 |
| 1991 | -0- |
| 1992 | -0- |
| 1993 | 310,000 |
| 1994 | 182,300 |
| 1995 | 2,278,000 (includes $2 million bonus) |
| 1996 | 1,012,000 (includes $1 million bonus) |

From FY 1982 through FY 1992, Mr. Reeves's salary remained low or he was unpaid so that profits could be invested to expand petitioner's business.  Beginning in FYE June 30, 1993, petitioner's business improved, and profits substantially increased.  Petitioner deducted the compensation paid to Mr. Reeves as officer compensation on its Forms 1120, U.S. Corporation Income Tax Return, in the fiscal years at issue.

In FYE June 30, 1995, petitioner paid $374,884 in salary and wages to its employees including $95,000 in bonuses, and in FYE June 30, 1996, petitioner paid $348,837 in salary and wages to

---

[7] The table does not include amounts UMI or CTC paid to Mr. Reeves.

its employees including $125,000 in bonuses.  Petitioner deducted these amounts as salaries and wages paid to its employees on its Forms 1120 in the fiscal years at issue.

Petitioner did not maintain a compensation policy for its officers and employees.  However, all 12 of petitioner's memorandums of consent to corporate action from FYE June 30, 1985 through 1996, indicated Mr. Reeves received less than full and adequate compensation for his role as petitioner's president and that petitioner would give future consideration to increasing Mr. Reeves's salary and/or award future discretionary bonuses to reimburse him for his past and present service.

The bonuses Mr. Reeves and petitioner's other employees received were not based upon a formula or previously set forth in writing.  Each bonus was determined and paid at the end of the fiscal year when petitioner could ascertain its cash availability and determine what would be a reasonable bonus, taking into consideration previous underpayments.

E.   Advertising Agreement With UMI

In the fiscal year previous to UMI's formation, petitioner's gross skin care and tanning products sales totaled $600,000 with $124,000 profit.  In an effort to increase sales, in June 1995 (in petitioner's FYE June 30, 1995), petitioner entered into an agreement with UMI by which, in exchange for $1 million, UMI agreed to brand, market, and advertise the skin care and tanning

products petitioner sold in UMI's FYE May 31, 1996.  Pursuant to a similar agreement petitioner paid $1,105,276 (in petitioner's FYE June 30, 1996) for the same services in UMI's FYE May 31, 1997.

As a result of UMI's services, within UMI's first fiscal year (FYE May 31, 1996), petitioner's gross receipts exceeded $1 million with $800,000 in gross profits from the sale of the products UMI branded, marketed, and advertised.[8]  Furthermore, in petitioner's 1997 fiscal year, UMI's services caused petitioner's gross receipts to double, exceeding $2 million and earning over $1 million in gross profits.  Petitioner deducted the amounts paid to UMI as advertising expenses in the fiscal years at issue.

F.    Mr. Reeves's Home and the Floating Structures

On September 24, 1993, Mr. Reeves purchased 1.2 acres along the Willamette River in Newberg, Oregon, which included Mr. Reeves's family residence and a dilapidated houseboat and a floating dock on the river behind and down a hill from the residence.  The residence was a two-story house with approximately 2,200 square feet per floor.  The first floor was a daylight basement used by the previous owner to store automobiles.  The houseboat and the dock were connected to Mr.

---

[8]  The record does not indicate CTC's earnings or the amount of time Mr. Reeves spent conducting its activities.  The record indicates Mr. Reeves sold CTC in 1997.

Reeves's property by a rundown gangway.  The houseboat, the dock, and the gangway were in a poor and dangerous condition.

In petitioner's FYE June 30, 1995, Mr. Reeves and petitioner entered into a lease agreement for $1,000 a month to provide petitioner with access from Mr. Reeves's residence to the houseboat and the dock, the use of his utilities, and the use of his parking lot, boat, and jet skis for advertising and promotional purposes.[9]  In the fiscal years at issue, petitioner also rented the first floor of Mr. Reeves's residence for $700 a month to store goods.

In 1995, Mr. Reeves and petitioner removed the dilapidated houseboat and the dock and hired a contractor to build a new houseboat, a 100-foot dock, and a floating garage (floating structures).  Construction of the floating structures was completed in the spring of 1996, and they were placed into service on May 28, 1996.[10]  The Oregon State Marine Board listed petitioner as the owner and Mr. Reeves as the coowner.[11]

---

[9] The $1,000 a month also allowed access to Mr. Reeves's tennis court and an enclosed area where corporate guests could place their children so they would be safe from falling into the Willamette River.

[10] Petitioner's Form 4562, Depreciation and Amortization, reported the property was placed into service on May 28, 1996.

[11] Mr. Reeves claimed that only petitioner owned the floating structures and he was listed as a coowner because the State required an individual contact.

The new houseboat was approximately 43 feet long and 28 feet wide. It had one floor with three rooms including a living area, a photo studio, and office space, and an open-air deck on top which included an outdoor cafe. Adjacent to the new house boat was the floating garage where Mr. Reeves's boat and jet skis and petitioner's tables and chairs were stored. The garage was covered and securely locked.

Petitioner and Mr. Reeves shared the costs of the floating structures' construction. Mr. Reeves paid $80,717 in 1995 and petitioner paid a total of $185,327: $95,046 in FYE June 30, 1995, and $90,281 in FYE June 30, 1996. Petitioner capitalized the $185,327 and depreciated the costs over a 39-year period. Petitioner reported these expenditures on its Forms 4562, Depreciation and Amortization, as leasehold improvements involving nonresidential real property and claimed depreciation deductions of $721 and $2,726 in the fiscal years at issue, respectively.

Petitioner and UMI used the floating structures for promotional events, meetings, and advertising photo shoots. Beginning in 1996, Mr. Reeves used the floating structures for personal purposes approximately 10 times a year. Neither petitioner nor Mr. Reeves kept a log of the use of the floating structures.

In 2002, Mr. Reeves sold his residence in Newberg, Oregon, as part of a bankruptcy sale. As part of the sale, petitioner sold the floating structures to Mr. Reeves's wife's company, Royal Sun Properties, L.L.C., for $100,000 with $55,000 paid as a downpayment.[12]

Respondent issued the notice of deficiency on March 8, 2002. Petitioner timely filed its amended petition on August 19, 2002.

OPINION

I. Reasonable Compensation

Petitioner contends the amounts paid to its sole executive and shareholder, Mr. Reeves, in the fiscal years at issue constituted reasonable compensation under section 162(a)(1). Conversely, respondent contends Mr. Reeves's compensation for the fiscal years at issue was unreasonable but, on the basis of respondent's expert's opinion, concedes deductions of $1 million and $750,000,[13] respectively.

---

[12] Royal Sun Properties, L.L.C., still owes petitioner $45,000.

[13] The $750,000 includes reasonable compensation paid to Mr. Reeves by petitioner and UMI together. Respondent argued on brief that if the Court accepted $750,000 as reasonable compensation for FYE June 30, 1996, it would be appropriate to divide this amount between petitioner and UMI and allow petitioner to deduct $499,012. Respondent alternatively argued that it would be appropriate to allow UMI its full claimed deduction of $509,000 if petitioner were allowed only $250,000 as reasonable compensation for its FYE June 30, 1996.

Section 162(a)(1) permits a taxpayer to deduct "a reasonable allowance for salaries or other compensation for personal services actually rendered". A taxpayer is entitled to a deduction for compensation only if the payments were reasonable in amount and in fact paid purely for services. Sec. 1.162-7(a), Income Tax Regs.[14] Although framed as a two-prong test, the inquiry under section 162(a)(1) generally turns on whether the amounts of the purported compensation payments were reasonable. Elliotts, Inc. v. Commissioner, 716 F.2d 1241, 1245 (9th Cir. 1983), revg. T.C. Memo. 1980-282. Petitioner has the burden of proving the payments to Mr. Reeves were reasonable. See Rule 142(a).

Because petitioner's place of business is in the State of Oregon, absent stipulation otherwise, an appeal of this case would go to the Court of Appeals for the Ninth Circuit. See sec. 7482(b)(1)(B). That Court of Appeals uses five factors to determine the reasonableness of compensation, with no single factor being determinative. Elliotts, Inc. v. Commissioner, supra. The factors are: (1) The employee's role in the company; (2) comparison with other companies; (3) the character and condition of the company; (4) potential conflicts of interest; and (5) internal consistency in compensation. Id. at 1245-1248.

---

[14] Respondent argues only that the amount of compensation was unreasonable.

- 14 -

When shareholder-officers who control the corporation set their own compensation, careful scrutiny is necessary to determine whether the alleged compensation is in fact a distribution of profits and a constructive dividend. Home Interiors & Gifts, Inc. v. Commissioner, 73 T.C. 1142, 1156 (1980).

II. The Elliotts Factors Applied to Petitioner's Compensation of Mr. Reeves

A. Role in the Company

The role the employee plays in the company focuses on the employee's importance to the success of the business. Pertinent considerations include the employee's position, hours worked, and duties performed. Elliotts, Inc. v. Commissioner, supra at 1245.

From petitioner's incorporation in 1979, Mr. Reeves's hard work and vision were critical and indispensable to petitioner's business and the primary reason for its overall success. He served as petitioner's president from its incorporation in 1979 and its secretary and treasurer from 1986. Mr. Reeves also handled all of petitioner's managerial duties. On a daily basis he managed petitioner's research, development, production, sales, and marketing and advertising (until UMI was spun off on June 1, 1995). Mr. Reeves also supervised petitioner's employees[15] and was responsible for all hiring and firing.

---

[15] Mr. Reeves testified that petitioner had approximately 25 employees during the fiscal years at issue.

Although Mr. Reeves did not devote 100 percent of his time to petitioner's business during the fiscal years at issue, as the only executive and manager he was the driving force behind petitioner's success.[16]  Mr. Reeves was a highly motivated employee who worked over 80 hours per week for petitioner during the first 6 months of its FY 1995 and a substantial amount of time during the second half of its FY 1995.  Despite managing two other companies during petitioner's FY 1996, Mr. Reeves continued to devote a substantial amount of time to petitioner's operations, which led to its further success.

B.    External Comparison

This factor compares the employee's compensation with that paid by similar companies for similar services.  Elliotts, Inc. v. Commissioner, supra at 1246; see sec. 1.162-7(b)(3), Income Tax Regs.  Courts often use expert witness opinions to evaluate the reasonableness of compensation.  Nonetheless, this Court is not bound by the opinion of any expert witness and may accept or reject expert testimony in the exercise of sound judgment.

---

[16] The record indicated the incorporation of UMI and CTC resulted in Mr. Reeves's performing fewer services and spending less time operating petitioner without delineating the number of hours per week Mr. Reeves spent operating petitioner.  However, the record did indicate that:  CTC was a separate corporation for one-half of petitioner's FYE June 30, 1995, and UMI was a separate corporation for 1 month of petitioner's FYE June 30, 1995; Mr. Reeves spent over 80 hours a week operating petitioner before CTC and UMI were spun off; and shortly after CTC and UMI were spun off Mr. Reeves's overall time spent working increased significantly.

Helvering v. Natl. Grocery Co., 304 U.S. 282, 295 (1938);

Silverman v. Commissioner, 538 F.2d 927, 933 (2d Cir. 1976),

affg. T.C. Memo. 1974-285.  Furthermore, the Court may be

selective in determining what portions of an expert's opinion, if

any, to accept.  Parker v. Commissioner, 86 T.C. 547, 562 (1986).

Only respondent offered expert testimony comparing Mr.

Reeves's compensation with that paid by similar companies for

similar services.  Respondent's proffered expert, Scott D.

Hakala, was a principal and director of CBIZ Valuation Group,

Inc., an appraisal, financial advisory, and litigation support

firm.  Mr. Hakala has a doctorate in economics, has worked as an

economist and financial analyst, and has testified on numerous

occasions as an expert in cases involving compensation disputes.

Mr. Hakala compared Mr. Reeves's compensation to chief

executive officer (CEO) compensation in five publicly traded

companies (guideline companies).[17]  He used four methods to make

the comparison:  (1) The average compensation paid to the CEOs

from the guideline companies; (2) a regression analysis based

upon the guideline companies' relationship between CEO

compensation and their respective sales;[18] (3) a guideline

---

[17] Mr. Hakala stated in his report and testified at trial
that he used the guideline companies because some or most of
their operations were based in the development and marketing of
nutritional products.

[18] The regression equation for 1995 was Y = 315653.0283 +
(continued...)

company's compensation-to-sales ratio of 7.1 percent;[19] and (4) the guideline companies' net margins. The financial information used in the four methods was obtained from the guideline companies' financial statements. The table below reflects Mr. Hakala's range of reasonable compensation for Mr. Reeves, computed by applying the four methods to the guideline companies' financial information:

_____

[18](...continued) 0.002365149(X). The regression equation for 1996 was Y = 325357.1548 + 0.002408813(X). Y equals CEO compensation and X equals revenue. Mr. Hakala's report did not explain how he configured the variables used in the regression analysis.

[19] The sales ratio is CEO compensation divided by company sales, expressed as a percent. Mr. Hakala's report stated that he used the sales ratio from only one of the five guideline companies, Natural Health Trends Corp (Natural Health), because it was the highest of the five companies' ratios. Natural Health's sales ratios for its FY 1995 and FY 1996 were 9.4 percent and 7.1 percent, respectively. Without indicating his reasoning, Mr. Hakala applied Natural Health's sales ratio of 7.1 percent to petitioner's sales for both FY 1995 and FY 1996. However, he should have computed the guideline company's sales ratio for FY 1995 by multiplying Natural Health's sales ratio of 9.4 percent by petitioner's sales for FY 1995, not the sales ratio of 7.1 percent. This computation would make the FY 1995 guideline company percent of sales $1,175,186, instead of $887,641.

Because the Court does not consider petitioner and UMI as a single company, i.e., combine their income, reasonable compensation under the "percent of sales" method for petitioner for FY 1996 is $405,388 instead of $409,323.

| Method | FYE 1995 | FYE 1996 |
|--------|----------|----------|
| Guideline cos. CEO compensation | $659,849 | $755,309 |
| Guideline cos. regression analysis | 345,222 | 339,111 |
| Guideline co. percent of sales | 887,641 | 409,323 |
| Guideline cos. net margins | 2,150,000 | 1,500,000 |
| Average of the methods | 1,010,678 | 750,936 |

The notice of deficiency allowed petitioner to deduct $1,044,809 and $367,382 as compensation to Mr. Reeves in the fiscal years at issue, respectively.  Mr. Hakala's report concluded the maximum reasonable compensation payable to Mr. Reeves in the years at issue was $1 million and $750,000,[20] respectively.[21]

On cross-examination, Mr. Hakala conceded he was unable to consider all the facts and circumstances needed to conduct a comprehensive analysis because his financial review was limited to petitioner's revenue and net income from FY 1985 through FY 1994 and petitioner's tax returns for the years at issue.  He testified that additional information could have made a material impact on his conclusions.[22]

---

[20] See supra note 13.

[21] Mr. Hakala's reasonable compensation determinations for the years at issue were the rounded averages of figures computed by applying the four methods to the guideline companies' financial information.  See table supra p. 18.

[22] In Mr. Hakala's report and at trial, he stated that he reserved the right to amend the report to reflect consideration of additional information.

Mr. Hakala admitted that there were six circumstances not considered in his report that could affect his findings in petitioner's favor. First, he stated that an employee who serves in multiple positions within a company may be compensated at a higher level to reflect the additional duties and responsibilities. He recognized that unlike the CEOs of the guideline companies, Mr. Reeves served in all of petitioner's executive and managerial roles. Consequently, his compensation should reflect the combined salaries of the positions he held. See Elliotts, Inc. v. Commissioner, 716 F.2d at 1246.[23]

Second, Mr. Hakala testified that typically an employee of a company like petitioner that has variable performance years and who is underpaid during those years is compensated at a higher amount in profitable years to make up for the lower income years.[24] In addition, when the employee is reimbursed at a later date, the time value of money is often considered in increasing compensation. Mr. Hakala's report did not take into account that in some of the years before the fiscal years at issue petitioner either underpaid Mr. Reeves or did not pay him at all.

---

[23] The average combined executive salaries for the five guideline companies during the fiscal years at issue were $1,019,418 and $1,124,167, respectively.

[24] Mr. Hakala stated that the common way to compensate employees in businesses with volatile performance is through a compensation plan that pays a fixed salary, with a bonus during good years and no bonus during years in which performance is poor.

Mr. Reeves testified that one of the reasons petitioner paid him a large bonus in its FY 1995 was to compensate for the years he was underpaid. Multiplying the sales ratio of 8.25 percent by petitioner's total sales in FY 1985 through FY 1994, the Court finds that Mr. Reeves was underpaid for 6 years:[25]

| FY | Amount underpaid |
|------|------------------|
| 1987 | $40,837 |
| 1988 | 61,842 |
| 1989 | 63,723 |
| 1990 | 58,098 |
| 1991 | 54,609 |
| 1992 | 83,414 |

The future values of the amounts underpaid as of December 31, 1995, were $81,102, $111,647, $101,436, $87,373, 71,771, and $94,021, totaling $547,350.[26]

Third, Mr. Hakala stated that a company experiencing losses may significantly decrease compensation to its CEO, and using the company as a guideline can result in understatement of executive income. Of the five guideline companies, in FY 1995 one experienced significant losses, and in FY 1996, three experienced substantial losses.[27] The five guideline companies' financial

---

[25] 8.25 percent was computed by averaging the sales ratios (9.4 percent and 7.1 percent) used to determine reasonable compensation under the "percent of sales" method.

[26] The future values were determined using the applicable Federal rate compounded semiannually under sec. 1274(d).

[27] Mr. Hakala testified that he chose the guideline companies because they developed and sold nutritional products and not because they sustained profits or losses.

characteristics during the fiscal years at issue are set out below:

| Guideline co. and year | Ratio of gross profits to sales (percent) | Net income/ loss (million) | Net income/ loss as a percentage of sales | Return on equity (percent) |
|---|---|---|---|---|
| NBTY, Inc. | | | | |
| 1995 | 40 | $5.4 | 3.2 | 6.6 |
| 1996 | 49 | 9.5 | 5.0 | 10.4 |
| National Health | | | | |
| 1995 | 53 | (0.5) | -15.7 | -17.5 |
| 1996 | 9 | (2.9) | -66.5 | -86.6 |
| Natural | | | | |
| 1995 | 29 | 2.0 | 5.4 | 15.3 |
| 1996 | 28 | 3.2 | 6.8 | 18.18 |
| Nutritional 21 | | | | |
| 1995 | 73 | 0.5 | 4.1 | 4.5 |
| 1996 | 61 | (4.4) | -27.7 | -25.9 |
| Reliv' | | | | |
| 1995 | 78 | 1 | 3.4 | 18.5 |
| 1996 | 38 | (10) | -31.2 | -188.1 |
| Average 1995 | 55 | 1.68 | 0.08 | 5.9 |
| Average 1996 | 37 | (0.92) | -22.72 | -54.4 |

Fourth, Mr. Hakala stated a CEO may be entitled to increased compensation during a year when his or her company earns higher profits. He opined that petitioner was more profitable than all five companies in terms of the ratio of net income to sales (net margin). Petitioner's net margins for the fiscal years at issue

were 8.7 percent and 7.0 percent, respectively,[28] exceeding the guideline companies' average net margins of 1.68 and -0.92, respectively.

Fifth, Mr. Hakala did not evaluate companies like petitioner, whose operations during FYE June 30, 1995, included advertising, indoor tanning services, and the sale of tanning products.

Sixth, Mr. Hakala stated that publicly held companies have additional costs of up to 5 percent as compared to privately held companies. As a result, petitioner would have fewer expenses and more income available to compensate its employees.[29]

In conclusion, the Court adopts three of the four methods[30] Mr. Hakala used to compute reasonable compensation. After taking into consideration the six circumstances not considered in his report, the Court finds that the table below sets out the ranges for reasonable compensation more accurately:

---

[28] In his report, Mr. Hakala indicated that in FYE 1996 the guideline companies exhibited increased sales, whereas petitioner's sales decreased by over 50 percent during the same period.

[29] In Mr. Hakala's report and trial testimony he stated that he reserved the right to amend the report to reflect consideration of additional information.

[30] Because the Court could not determine how Mr. Hakala computed reasonable compensation under the regression analysis, the Court did not consider the regression analysis method to determine petitioner's compensation of Mr. Reeves.

| Method | FYE 1995 | FYE 1996 |
|---|---|---|
| Guideline cos. CEO compensation | $1,019,418 | $1,124,167 |
| Guideline cos. percent of sales | 1,175,186 | 405,388 |
| Guideline cos. net margins | 2,150,000 | 1,500,000 |
| Average of the methods | 1,448,201 | 1,009,852 |

In addition, taking into consideration the $547,350 Mr. Reeves was underpaid as of December 31, 1995, the reasonable compensation for petitioner's FY 1995 is increased to $1,995,551.

C.    Character and Condition of the Company

This factor requires the Court to focus on petitioner's size as measured by its sales, net income, or capital value; the complexities of the business; and general economic conditions. See Elliotts, Inc. v. Commissioner, 716 F.2d at 1246.

Petitioner was a relatively small company that had secured itself a market niche enabling it to earn high profit margins on its product sales and services.

Petitioner's income was modest until 1993 when it began to experience a substantial increase.  Gross sales grew from $661,928 in FYE June 30, 1991, to $2,074,682 and $1,936,476 in FYE June 30, 1993 and 1994, respectively, and continued to increase in the fiscal years at issue to $12,501,980 and $5,709,686, with net margins of 8.7 and 7 percent, respectively. Petitioner's net income was substantially higher than the guideline companies' average and each guideline company's individually, except for NBTY, Inc.'s FY 1996.  Moreover,

petitioner's shareholders return on equity increased to 93 percent and 25 percent in the fiscal years at issue, respectively. These percentages were also substantially higher than the guideline companies' average, as discussed below.

Although petitioner's business may not have been a complex operation, this Court does not consider it to have been a simple task for Mr. Reeves to operate petitioner as its sole executive and manager. Neither petitioner's sales nor its gross profits could have been attained but for the personal skills of Mr. Reeves.

D. Conflict of Interest

This factor examines whether a relationship exists between the company and the employee which may permit the company to disguise nondeductible corporate distributions as section 162(a)(1) compensation payments. Close scrutiny may be used when the paying corporation is controlled by the compensated employee, as in the instant case. Elliotts, Inc. v. Commissioner, supra at 1246-1247. However, the mere fact that the individual whose compensation is under scrutiny is the sole shareholder of the company, even when coupled with an absence of dividend payments, "does not necessarily lead to the conclusion that the amount of compensation is unreasonably high." Id. at 1246.

The Court of Appeals for the Ninth Circuit formulated the inquiry by evaluating the compensation payments from the

perspective of a hypothetical independent investor.  The prime indicator is the return on the investor's equity.  Id. at 1247. If the company's earnings on equity after payment of the compensation remain at a level that would satisfy an independent investor, there is a strong indication that the employee is providing compensable services and that profits are not being siphoned out of the company disguised as salary.[31]  Id.  The Court of Appeals in Elliotts calculated the return on equity using the yearend shareholders equity.  Id.  Dividing petitioner's net income book value by the yearend shareholders equity results in the following:

| FYE June 30 | Percent return on equity |
|-------------|--------------------------|
| 1995        | 93 percent               |
| 1996        | 25 percent               |

Petitioner's return on equity substantially exceeded the guideline companies' average return on equity of 5.9 percent and -54.4 percent during the fiscal years at issue, respectively, and exceeded each specific company's return on equity.[32]  Mr. Reeves was solely responsible for petitioner's success and performed the

---

[31] The Court of Appeals for the Ninth Circuit found that a 20-percent average rate of return on equity would satisfy a hypothetical inactive independent investor and indicated the corporate employer and its shareholder/employee were not exploiting their relationship.  Elliotts, Inc. v. Commissioner, 716 F.2d 1241, 1247 (9th Cir. 1983), revg. T.C. Memo. 1980-282.

[32] See the table showing each guideline company's return on equity supra p. 21.

services which were directly responsible for petitioner's profitability.

E.    Internal Consistency in Compensation

This factor focuses on whether the compensation was paid pursuant to a structured, formal, and consistently applied program.  Elliotts, Inc. v. Commissioner, supra at 1247.  Bonuses not paid pursuant to such plans are suspect.  Salaries paid to controlling shareholders are also suspect if, when compared to salaries paid to nonowner management, they indicate that the amount of compensation is a function of ownership, not corporate management responsibility.  Id.

Bonuses paid to employees are deductible "when * * * made in good faith and as additional compensation for services actually rendered by the employees, provided such payments, when added to the stipulated salaries, do not exceed a reasonable compensation for the services rendered."  Sec. 1.162-9, Income Tax Regs.  No internal discrepancy exists when a company pays and deducts compensation for services performed in prior years.  Elliotts, Inc. v. Commissioner, supra at 1248.

Financial stability was the crucial element in petitioner's growth strategy.  To foster petitioner's growth, from 1979 through 1992 petitioner either underpaid Mr. Reeves, petitioner's sole executive officer and manager, or did not pay him at all.  Petitioner retained Mr. Reeves's compensation and used it to

further develop and expand its business. Petitioner stated in its memoranda of consent to corporate action that it would reimburse Mr. Reeves for past underpayment and pay bonuses for the extraordinary services he provided when petitioner became more profitable.

Petitioner was a very profitable company in the fiscal years at issue and paid Mr. Reeves and its other employees bonuses. The bonuses paid were not awarded under a structured, formal, or consistently applied program but were paid under petitioner's plan to award a bonus for present hard work and prior years' lack of compensation when it became more profitable.

F.    Conclusion

Mr. Reeves, petitioner's sole executive officer and manager, was the driving force behind petitioner's success. His vision and hard work resulted in petitioner's realizing sales of $12,501,980, and $5,709,686, with a shareholders return on equity of 93 percent and 25 percent in the respective fiscal years at issue. The averages of the methods used to determine reasonable compensation were $1,448,201 and $1,009,852 in the respective fiscal years at issue, and taking into consideration the $547,350 Mr. Reeves was underpaid as of December 31, 1995, the Court finds

that $2 million and $1,012,000 in the respective fiscal years at issue are deductible under section 162(a)(1).[33]

III. Advertising Expenses

Petitioner argues it is entitled to deduct advertising expenses under section 162(a) of $1,105,276 for its FYE June 30, 1996.

Advertising expenses are a type of ordinary and necessary expense for which a current deduction is allowed to an active trade or business. Sec. 162(a); sec. 1.162-1(a), Income Tax Regs. Advertising expenses are allowed as a deduction under section 162 if the taxpayer can demonstrate a sufficient connection between the expenditure and the taxpayer's business. See RJR Nabisco Inc. & Consol. Subs. v. Commissioner, T.C. Memo. 1998-252.

Petitioner is an active trade or business that entered into an exclusive contract with UMI to conduct all of petitioner's marketing, advertising, and branding in the fiscal years at issue. In its FYE June 30, 1996, petitioner paid UMI $1,105,276 and deducted this amount as advertising expenses.

Respondent argues that $831,137 of the advertising expenses was not for ordinary and necessary advertising expenses because it was a distribution to Mr. Reeves from UMI and not paid as

---

[33] Conversely, the Court finds $278,000 of the $2,278,000 claimed by petitioner as a deduction for FYE June 30, 1995, to be nondeductible.

- 29 -

advertising expenses.  As a result, respondent reduced petitioner's allowable advertising expenses to $274,139.

UMI received the $1,105,276 during its FYE May 30, 1997. UMI did not receive a notice of deficiency for this year, and its FY 1997 is not at issue in this case.  Respondent did not produce UMI's tax return for the FY 1997, evidence showing Mr. Reeves received a $831,137 distribution from UMI, or evidence indicating how UMI used the amounts petitioner paid for advertising.

Respondent's revenue agent Steve Rans, who conducted the audit of petitioner's returns, testified that in determining ordinary and necessary advertising expenses he did not take into consideration wages paid by UMI, UMI's costs of creating and developing ideas, nor all the activities UMI performed to market, advertise, and brand petitioner's suntan lotion products.

Mr. Reeves testified that UMI had a substantial marketing and advertising plan to create a lifestyle image for petitioner's products by:  (1) Developing product catalogs; (2) designing packaging and logos; (3) developing trade show display booths; (4) attending trade shows; (5) meeting with salespersons to educate them on petitioner's products and how to sell them; and (6) producing radio advertisements and promoting sporting events to advertise petitioner's products.

Steve Rans also testified that because of UMI's marketing and advertising in the FY 1996 and FY 1997, petitioner's gross

receipts from the sale of suntan products grew to $2,999,000, with $1,800,000 profit.

The Court finds that petitioner showed a sufficient connection between the $1,105,276 paid in advertising expenses and its business of producing and selling suntan lotion products. Therefore, this Court finds petitioner is entitled to deduct the $1,105,276 in advertising expenses under section 162(a) for FYE June 30, 1996.

IV. Floating Structures

Petitioner contends that it may depreciate its cost of building the floating structures because the structures were used primarily for business purposes.

Respondent does not dispute petitioner's costs incurred building the floating structures. Rather, respondent contends that petitioner failed to establish the floating structures were used in petitioner's business during the fiscal years at issue.

Section 167(a)(1) allows as a depreciation deduction a reasonable allowance for the exhaustion, wear and tear, and obsolescence of property used in a trade or business.[34] The taxpayer bears the burden of proving the Commissioner's determinations are incorrect. Rule 142(a). Furthermore, each deduction must be carefully scrutinized when the taxpayer is a

---

[34] Petitioner did not argue that the floating structures were property held for the production of income under sec. 167(a)(2) or that the floating structures qualify for depreciation as entertainment facilities under sec. 274(a)(1).

closely held corporation.  <u>Intl. Artists, Ltd. v. Commissioner</u>, 55 T.C. 94, 108 (1970).

The floating structures were placed in service on May 28, 1996, approximately 1 month before the end of petitioner's FYE June 30, 1996.  The structures were under construction in 1995.  Thus, they were not used in petitioner's trade or business during its FY 1995.  See sec. 167(a)(1).  Therefore, this Court finds petitioner is not entitled to a depreciation deduction pursuant to section 167(a)(1) in FYE June 30, 1995.

Mr. Reeves testified that after the floating structures were placed into service, they were used primarily by petitioner and UMI to develop advertising for the purpose of promoting petitioner's skin care and suntan lotion products, nutritional supplements, and health food products.  He testified the advertising work included photo shoots that involved people around water; i.e., riding jet skis, skiing, or lying out in the sun next to the river.  Petitioner also indicated the property was used for promotional events.

Neither petitioner nor Mr. Reeves kept logs of petitioner's or UMI's business use of the floating structures from May 28, 1996, through FYE June 30, 1996.  The only evidence petitioner offered to establish that the floating structures were used for a business purpose was Mr. Reeves's testimony and several undated

photographs or photographs used in petitioner's advertising dated before the floating structures were completed.

Petitioner did not provide any evidence showing that the floating structures were used primarily or at all for business purposes during the last month of FYE June 30, 1996.[35]  See Hobson Motor Co. v. Commissioner, T.C. Memo. 1990-297. Therefore, this Court also finds petitioner is not entitled to a depreciation deduction pursuant to section 167(a)(1) for FYE June 1996.

The Court, in reaching its holdings, has considered all arguments made and concludes that any arguments not mentioned above are moot, irrelevant, or without merit.

To reflect the foregoing,

Decision will be entered

under Rule 155.

---

[35] The lack of adequate documentation also precludes any deductions for entertainment, amusement, or recreation with respect to a facility used in connection with such activities. Sec. 274(d)(2); see Finney v. Commissioner, T.C. Memo. 1980-23.